**KOEHLER v. SIRCOVICH.** (No. 8519.)

(Court of Civil Appeals of Texas. Galveston. Jan. 29, 1925. Rehearing Denied Feb. 19, 1925.)

1. **Libel and slander** ⊂⇒44(3)—Employer may question employee as to money taken from cash register, but may not publicly brand her as a thief.

An employer, who honestly believes that employee has taken money from cash register, may question her in regard to the matter, and make such statements to employee and others having interest in matter as employer has reasonable grounds to believe were true, but may not publicly and falsely brand such employee as a thief, though not actuated by malice.

2. **Libel and slander** ⊂⇒112(2)—Evidence held to sustain finding that employer in charging employee with theft did not act in good faith.

In action against former employer for slander, evidence held to sustain finding that employer in charging plaintiff with theft in presence of other employees and of customers in store did not act in good faith.

3. **Libel and slander** ⊂⇒44(3) — Employer's statements charging employee with theft, not made in good faith, were not privileged.

Statements by employer charging employee with theft, where not made in good faith, were not privileged.

4. **Libel and slander** ⊂⇒7(13)—Words charging theft defamatory per se.

Employer's statement that employee took money from cash register held per se defamatory.

5. **Libel and slander** ⊂⇒101(1)—Malice presumed from publication of statements charging theft.

Malice will be presumed from publication of statements charging theft, such statements being defamatory per se.

6. **Libel and slander** ⊂⇒123(2)—Determination of meaning of language used is ordinarily for jury.

In action for slander, it is ordinarily the province of the jury to determine the meaning of the language used.

7. **Libel and slander** ⊂⇒19—Test as to meaning of language used, stated.

The test as to meaning of language used is that which would be placed thereon by average person, or the general public, and not the construction placed upon it by plaintiff.

8. **Appeal and error** ⊂⇒1050(1)—Plaintiff's testimony in slander action as to meaning of language used held harmless.

In action against former employer for slander based on statement charging her with taking money from cash register, admission of plaintiff's testimony that she understood the meaning of defendant's language to "brand me as a thief" held harmless, since language could not have been reasonably construed otherwise.

9. **Libel and slander** ⊂⇒124(3)—Instructions as to facts justifying finding of malice held sufficient.

In action for slander, instructions as to facts to be shown to justify finding that accusation was made maliciously held sufficient.

10. **Libel and slander** ⊂⇒112(2)—Malice may be shown by circumstantial evidence.

Evidence of facts and circumstances from which malice is reasonably inferable is sufficient to show its existence.

11. **Libel and slander** ⊂⇒121(2)—$10,000 actual damages and $5,000 punitive damages for slanderous statement accusing plaintiff of theft held not excessive.

Where employer without acting in good faith charged employee with being a thief in the presence of other employees and customers in defendant's store, and plaintiff as result thereof became nervous and hysterical and in ill health, and continued in ill health and unable to work up to time of trial, allowance of $10,000 actual damages and $5,000 punitive damages was not excessive.

⊂⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**12. Damages ⬡⟺94—Exemplary damages measured by rule of just punishment.**

Exemplary damages are not measured by the rule of fair' compensation, but by the rule of just punishment.

Error from District Court, Harris County; Ewing Boyd, Judge.

Suit by Anna Sircovich against C. F. Koehler. Judgment for plaintiff, and defendant brings error. Affirmed.

E. P. & Otis K. Hamblen and Campbell, Myer, Simmons & Hawkins, all of Houston, for plaintiff in error.

Franklin & Blankenbecker and Lewis Fisher, all of Houston, for defendant in error.

PLEASANTS, C. J. This is a suit to recover damages for slander brought by defendant in error against the plaintiff in error.

The petition alleges, in substance:

"That plaintiff was in the employ of defendant, as a clerk in his mercantile business, in the city of Houston, continuously from December 3, 1906, to August 21, 1921, and that from and after the year 1909 she was the confidential clerk of defendant and had access to the cash register, and during defendant's absence, in the years from 1912 to 1919, she had charge and management of the business, collected and disbursed the moneys received in the business, collected defendant's rents, and had authority to draw checks against defendant's bank account; that during all of these years she faithfully and honestly served defendant and was ever watchful of his interest, as defendant well knew.

"That this plaintiff has at all times borne a good name and reputation for morality and honesty and integrity in this community, and was well and favorably known among her friends as well as among the patrons and customers of this defendant.

"That more particularly on or about the 21st day of August, 1920, while this defendant was busily engaged in waiting on one of defendant's customers, a lady, whose name is unknown to plaintiff, in his store, this defendant after looking into his cash register, in the presence and hearing of plaintiff and of other clerks, to wit, Henry Finkelman, Miss Emma Fowler, and during part of this time —— Bidwell, as well as numerous customers, men and women, whose names are unknown, who were in said store at said time, unmindful of plaintiff's good name and reputation, and maliciously intending to degrade and humiliate plaintiff and deprive her of her good name and reputation, called out in a loud, boisterous, and ugly voice and in a threatening manner to this plaintiff: 'Look here, Anna! There is $30 missing out of the register; you took it.' That this plaintiff was much surprised and astounded by this statement and said to defendant: 'I don't know anything about it; you are mistaken.' The defendant then again in a loud, boisterous, and ugly voice and threatening manner called out to this plaintiff, in the presence of the other clerks and customers in said store: 'You certainly did take it. Who else took it, if you didn't take it, because no one else has access to the cash register, but you?' This plaintiff then said to defendant, 'Surely 'Mr. Koehler, you do not think I took your money,' and offered to come to the register and check up the cash, whereupon defendant cried out in a loud voice and threatening manner to her, in the presence of the other clerks heretofore named and numerous customers, men and women whose names are unknown to plaintiff, in said store: 'Keep your hands right out of this cash register. Get your hat on and go home. I don't want you around here any more.'

"That plaintiff further represents and charges that the defendant, by the use of said words as hereinbefore set out, undertook to and did charge this plaintiff with theft and being a thief and with having stolen from him the sum of $30; that all of said statements were wholly false and untrue and were willfully and maliciously made by the defendant with the full knowledge that they were untrue at the time they were made. This plaintiff represents that she did not take $30 from the defendant, or his cash register, and did not take from him any sum of money whatever, and she charges that said statements were falsely and maliciously made by the defendant with the intent to defame and disgrace her and to destroy her good name and reputation, and, as plaintiff further verily believes, as an excuse to discharge her because he thought her health was failing, and which had become impaired in the service of this defendant.

"That all of said false charges and accusations so made by defendant were made in a loud, angry voice and a threatening manner, and in the presence of other clerks heretofore named and customers, men and women, whose names. are unknown to plaintiff, in said store, and were calculated to and did embarrass and humiliate and distress this plaintiff and tended to and did degrade and disgrace her and damage her good name and reputation in the eyes and opinion of her coemployees and the customers in said store, as well as with the public generally. That said false charges and accusations have further seriously and permanently affected her health and have destroyed her chances of earning a livelihood."

It is then alleged that the false and slanderous charge so maliciously made against her by the defendant caused her great humiliation and shame, and made her suffer great physical and mental pain and anguish, and so impaired her health as to greatly reduce her earning capacity. Plaintiff claimed actual damages in the sum of $10,000, and $20,000 as exemplary damages. The substance of defendant's answer is stated in his brief as follows:

"Plaintiff in error by first amended answer addressed general demurrer and numerous special exceptions to the petition, general denial, and specially pleaded, in brief substance, that during the latter years of her employment in his store defendant in error was forelady in charge of his business, having access to his cash register, authority to and did receive money, make change and pay out money, with the duty to see that the cash in the register was properly kept and accurately accounted for and to see that all of the other employees properly performed their

⬡⟺For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

duties; she being in authority over them. He further alleged that on various occasions before her employment was severed the cash in the register would be out of balance and sometimes short or missing, to which he had frequently called her attention to advise her of such conditions and to stimulate more careful and watchful attention to his business on her part.

"He averred concerning the occurrence that is the basis of her suit that during the absence for lunch of the only other of his employees having access to the register, and while defendant was on duty making change and receiving money, he had occasion to go into the cash register and noted the amount, kind, and denominations of currency therein, and a few moments thereafter was called to the front of the store on business, and upon his return to the register only a few minutes later he discovered that the currency was differently arranged in the drawer and some $10 bills missing therefrom (thought by him at first glance to be three tens, but immediately finding that only two tens were missing). He thereupon called her attention to the missing money, according to his allegations, in an ordinary tone with the statement that it looked to him as though the same old thing had happened as before; that she was the only one then in the house that had any right to go into the cash register; that he had left her standing by the register when he went to the front of the store, and it seemed to him she should know who took the money; that it looked to him like she was not properly looking after his business, and if she could not do better, he had no further need of her services and might as well give her her salary, which he did, and later in the afternoon she left his store and employ.

"He alleged that the money was missing from the register drawer and that he asked her, as was his right, for an explanation of what had become of the money; she being at the time the only one in charge of the register. He specifically denied that he called her a thief or accused her of stealing, or acted with malice or intent to injure her, or took any improper attitude in the premises towards her, and that all of his statements, questions, and conduct on such occasion were in accordance with his right and duty in properly managing his business, and were privileged matters, and he specifically denied that she had been injured thereby. He further alleged that he had missed money from his said register on previous occasions, and, as conditions had become very unbusinesslike in this respect, he naturally looked to her, his forelady, handling his cash and having authority over all of his other employees, for explanation. He averred that in good faith and with a sincere, honest purpose, and without malice, he was the more moved to know of her where the money was going as, without apparent income to justify such large outlays of money, and while holding such position and authority in his employ, she had purchased an Oldsmobile automobile for about $2,100, paying cash for same, and had bought a building lot in Montrose addition to the city of Houston, paying about $3,750 cash for same, and maintained the expense of the upkeep of such automobile and in a manner lived far beyond the apparent financial resources of herself and her family. While missing money and taking note of these circumstances, he avers he felt it incumbent upon himself, as any prudent employer in the proper management of his business in good faith and without malice would

have done, to ask her for an explanation of the missing money, and when none was forthcoming to sever her employment with him, as was done, and that he is in no manner liable to her."

The cause was submitted to a jury in the court below upon special issues. In response to the questions submitted, the jury found that the defendant used the language to plaintiff as set forth in her petition, and that the statement so made by him was untrue; that in using such language to plaintiff, the defendant was prompted by existing "malice" as that word had been explained and defined in the charge of the court; that persons other than plaintiff and defendant heard the accusation complained of by plaintiff at the time defendant made same, and that defendant knew that other persons were present when he made the accusation; that plaintiff was entitled to receive $10,000 as compensation for the injuries caused her by defendant's accusation, and the further sum of $5,000 as exemplary damages. Upon the return of the verdict, judgment was rendered in favor of plaintiff against the defendant for the sum of $15,000.

The findings of the jury that defendant made the accusation as alleged in plaintiff's petition, that it was false, and that it was knowingly made by the defendant in the presence and hearing of a number of other clerks and customers in defendant's store, is amply sustained by the evidence. In fact, we do not understand appellant's brief as questioning the sufficiency of the evidence to sustain these findings; his contention being that the statement made by defendant to plaintiff was privileged or conditionally privileged, and there is no evidence to show malice on his part in making such statement.

The plaintiff testified that she had known the defendant for about 17 years and had worked for him continuously from December, 1906, to August 21, 1920. Her testimony shows that until about a year preceding her discharge his conduct towards her had shown his confidence in her and appreciation of her faithful service. She says:

"Mr. Koehler's attitude towards me was just ordinary from the time I commenced to work for him. I seemed to prove very satisfactory. It seemed like he was satisfied with my services. That continued on up to the time he discontinued my services. He was not always kind and affectionate towards me. Towards the last he got kind of peculiar like. Sometimes when I'd go to lunch, and when I would get back he would take out his watch and ask me why I was late, or something like that, and really I would not be late. He did that a lot of times towards the last of my employment. I suppose it started about the last year of my employment there. * * * I did notice a change in Mr. Koehler's attitude towards me in the last year of my employment there from what it had been previous to that time. For instance, in the instances where I would go to lunch and would come back on time he would

say something about it anyhow, and what made me notice that so plain was some of the others would really be late and he would never say anything to anybody else, but always would to me. That was one thing I particularly noticed. Then, also, if the stock was not out, or something like that, he would always tell me about it when it would not always be me that sold the articles. * * * But he always came after me to go and get it and see about it and all, always, you know, getting after me about it, and I was not supposed to do that. I was supposed to get my own stock, because I was not responsible for what the others done in that way when Mr. Koehler was in the store, but when Mr. Koehler was absent I was. * * * On the week previous to this day that he discharged me, there was also something happened in the store between Mr. Koehler and I. It was on the Saturday previous to this Saturday that he discharged me that this happened. On that day Mr. Koehler went to his dinner, and he came back and went to the cash register, and he says, 'Look here! There is a whole lot of money missing out of this register.' And he said, 'Did you pay anybody, or what did you do with it?' And I said: 'Mr. Koehler, I didn't pay anybody out of that drawer. If I had, I would have made a note of it and put in the register. * * * Let's see what is wrong.' And he said, 'Oh, well, that old register doesn't work, anyhow.' I said: 'Well, let's see, anyhow. I won't be satisfied. I want to see what is wrong here.' And finally I did persuade him to open the total adder, and he took it out, and the register balanced up all right. * * * There were no other occasions that I know of where the register would not balance, only sometimes he would say to Miss Barr and me, 'Look here, girls, you all have to be more careful. This register don't tally,' or something like that."

Her testimony as to what the defendant said to her and the circumstances in which his statements were made is as follows:

" * * * I was waiting on a number of customers there just immediately prior to the occurrence complained of in my petition, and was making change for the different ones. The last time I had made change before that was when I opened the register to make change for Mr. Finklemann. So I gave Mr. Finklemann the change, $3.55, and I went around the counter, and it was so crowded in there that I had to excuse myself to get around there, and as I got up towards the middle of the aisle a lady held up a toy broom and says, 'How much?' and I said, 'Thirty cents,' and she brought it to me, and we met halfway. It was rather crowded, and I was wrapping up the broom for this lady, and during the time I was wrapping it Mr. Koehler says: 'Look here, Anna! There is $30 missing out of this register. You took it; of course, you took it;' and threw out his hands like that, and said, 'Of course, you took it. Who else took it if you didn't?' I said: 'Mr. Koehler, I don't know anything about it. I am surprised.' And he said: 'Of course, you took it. You are the only one that has access to the register.' So I said: Mr. Koehler, I am not the only one that has access to the register; you also have access to the register.' And I said, 'Let me see,' and he said: 'No,

you don't see; no such stuff. You keep your hands out of this register and don't ever put your hands on this régister again. Get your hat and go home. Get your hat and go home.' His nature and tone of voice, and his attitude and his general conduct at the time he made this statement to me was this: He made the statement in a very loud tone of voice and kept throwing his hands at me like this, and I was on this side of the counter and he was on the other side of it. He spoke loud enough so that other people in the store could hear him; every one in there could have heard him, even if somebody had been away back in the store, because he talked very loud. So then I told him, 'You can search me, Mr. Koehler,' and he said, 'Oh, I don't want to do that,' and I said; 'I am right here; I won't move from this spot, and you can search me if you think I took it.' I also offered to him to go around there and see what was wrong, and he said: 'No, you don't. Keep your hands right out of this register. Don't ever put your hands on this register again. Get your hat and go home. I don't need you around here any more.' * * *

"After Mr. Koehler had made the charges about which I have testified, everything got black, and I had to hold to the counter, and I was so ill and bewildered that I began to cry, and Mrs. Fowler then led me back to the end of the store, and I sat down there on a box and commenced crying because he had told me numerous times to get my hat and get out of there, and I was so ill and bewildered and nervous I didn't know what to do. During the time Mr. Koehler was shaking his hands at me, he had something in his hands; he had $20 and a rent receipt for me. My rent was up on that day. I was renting a cottage from him, and my rent was up on that 21st of August, on the very day that this thing happened. * * *

"I don't remember just how long it was; I was so bewildered and nervous and crying that I didn't keep much account of how long I stayed there. While I was back there, Mr. Koehler came back where we were, and while he was back there he says he is 'done with me now,' and I said: 'Do you realize what you have done to me? You have taken the bread right out of my mouth. You have branded me as a thief right before my fellow workers and the public.' I said: 'I was rich in my character, but now you have robbed me even of that by accusing me of theft which I am not guilty of.' 'Well,' he said, 'It is all over with now,' and I said, 'It is not over for me, because it has just started for me, and I have the world to face with the slander against me.' * * *

"In this statement to me which I have detailed to the jury, made there at the cash register, there were other people there present in the store when he made it; there was Mr. Finklemann and Mrs. Fowler. They were right close to me at the time. Then there were numerous customers in the house, and I was waiting on this lady for the toy broom at the time."

Plaintiff's testimony as to the language used to her by the defendant, the circumstances, the manner in which defendant acted towards plaintiff, and the number of persons in the store at the time, was fully corroborated by Mrs. Fowler, a witness for plaintiff. This witness further testified:

·"When Mr. Koehler made these statements to Miss Anna concerning her about which I have just testified, she told him she had not taken the money, and also told him she would come around there and check up with him, and he told her she wouldn't, that she wouldn't put her hand in the register any more, and then she looked very faint and weak, and I went and stood by her because I thought she was going to faint. Then, afterwards. I led her toward the back, and she went around and got her hat and purse, I think, to go home. When she got her hat and purse, why she came out and went back, and I went back in the store with her. Miss Anna did suggest to Mr. Koehler that she come around and see about it and offered to check up the register, but he wouldn't do it, and told her to keep her hands out of the register and to get her hat and go home. At that time I also made the suggestion to Mr. Koehler to search Miss Anna, and Miss Anna also told him: 'My purse is back there. I am willing to be searched.' And he said, 'No, I wouldn't do that.' He wouldn't search her or her purse, although she agreed to have it done. After I took Miss Anna to the back part of the house, she sat back there on a box and cried and looked very pale and weak and spent most of the evening while she was there in crying. I think she left there about 3 o'clock in the afternoon. I have no distinct recollection as to the exact time she left, but I think it was about 3 'o'clock. When she left it seemed as though she was all nervous and torn up and she left there crying.

"Shortly after this occurrence to which I have just testified and on the same day, I did hear a conversation between Mr. Koehler and Miss Maud Barr. At the time this conversation occurred, Mr. Koehler was standing inside of the door, right close to the front. Mr. Koehler, at the time he had the conversation with Miss Barr, was not as nervous as he had been, but yet you could tell he was still nervous over it. Miss Maud Barr was a clerk in the store at that time. When she came in, about which I just started to testify, Mr. Koehler asked Maud, he said, 'Maud, how much money was in the register when you left?' And she said, 'It was a twenty and a ten and some fives, and I don't know how many ones,' and she asked him, 'Why, Mr. Koehler?' and he said 'Well, there is $30 missing, and I have fired Anna,' and she said 'I don't think Anna would have taken, it,' and he said, 'You can't always tell.'

"Further,' I do know how Mr. Koehler treated Miss Anna in reference to the manner he treated other clerks in the store, say within the last year she was there. It seemed to me like just the last few months of that time he was not quite as nice to Anna as he had been; it seemed like there was a little difference. I do not believe I can give you any concrete idea of just how this manner was manifested by Mr. Koehler and in what way; that is, that he didn't treat her exactly like the rest of them. I do mean that his attitude towards Miss Anna was during the last few months of her employment there, was different from what it had been before that time, but I cannot give some incidents of why I think that and I ·do not believe I have any fact upon which I can base it. The only reason I think so is just the way he would speak to her, but I haven't any special thing that I can say, that I can recall at the present time. It is just my general impression in my mind that he was different towards her during the last few months that she was there; I gathered that by the way he would speak to her. I cannot say, just how Mr. Koehler would talk to Miss Anna, but, just as I was saying, I noticed just a little difference in the way he had before, you know, speaking and talking to her about business matters. During those last few months I spoke of, it seemed like he was kind of short with her in speaking to her."

Miss Barr, a witness for plaintiff, testified to the conversation between herself and defendant, repeated in the testimony of the witness Fowler before set out. She also testified:

"During the latter part of the time that Miss Anna was working for Mr. Koehler, I noticed a difference in the manner in which he treated her from the way he had treated her in years past. I have nothing special in mind that causes me to say that, but I do not believe Mr. Koehler discussed his business affairs with her towards the last as much as he did in former years. Prior to that time, he had discussed his business affairs with her, but towards the last he did not as much as he did before."

We shall not discuss or set out in detail the various propositions presented in appellant's brief. His main contention is presented under the following proposition:

"The district court erred in entering judgment in this case against plaintiff in error for any amount as actual damages, because the evidence wholly failed to show that defendant in error had suffered any actual damages for which plaintiff in error was legally liable; the statements of which defendant in error complained being privileged in law. Defendant in error wholly failed to prove that plaintiff in error in making the statements was actuated by malice or spite, or that he acted without probable cause."

In support of this proposition appellant cites and relies upon the cases of Ry. Co. v. Richmond, 73 Tex. 568, 11 S. W. 555, 4 L. R. A. 280, 15 Am. St. Rep. 794; Simmons v. Dickson, 110 Tex. 230, 213 S. W. 612, 218 S. W. 365; Foley Bros. v. McClain (Tex. Civ. App.) 231 S. W. 459; Ry. Co. v. Edmundson (Tex. Com. App.) 222 S. W. 181; and Behee v. Ry. Co., 71 Tex. 424, 9 S. W. 449.

These cases sustain the proposition that a defamatory publication made in good faith in reference to a matter in which the person making the publication has an interest is conditionally privileged if made for the purpose of protecting that interest, and in such case, although the statements made may be untrue, malice cannot be implied from the fact of publication, but the existence of an evil motive must be otherwise shown. The cases further hold that neither the vehemence of language used nor the manner or actions of the person when making the defamatory statements is sufficient to show malice. We do not think the rules of law invoked by

this proposition are applicable to the facts of this case.

[1, 2] In none of the cases cited was it shown that the defamatory statements were made in the hearing of others in no way interested in the matter, and in none of them was the good faith of the defendant drawn in question as, in this case. The right of the defendant, if he honestly believed that plaintiff had taken the money from the cash register, to question her in regard to the matter and to make to her and all others who had any interest in the matter such statements in regard thereto as he had reasonable grounds to believe were true, seems to be well settled by the decisions of our courts. But this right cannot be extended into a license to publicly and falsely brand one as a thief, even though the accuser may not be actuated by malice in making the charge. It would seem upon principle and authority that the right to make such false statements, when made in good faith, is so restricted that they may only be made to those directly interested in their subject-matter and to whom the accuser is under a duty to communicate facts which he believes to be true. Such situation is not disclosed by the facts of this case. Defendant's public defamatory language in regard to plaintiff cannot by any stretch of the imagination be regarded as a communication made in the discharge of any duty he owed to another or to the public. But if it be conceded for the sake of argument that the statements made by defendant might be considered conditionally privileged, this could only be so if they were made in good faith, and the evidence amply sustains the finding of the jury that they were not so made. He refused to allow her to go with him to the cash register and examine it to see if it showed that any money which had been placed therein was missing, and refused to examine her purse or search her person for the money he claimed to be missing. The undisputed testimony shows that on the Saturday before this occurrence he had claimed that money was missing from the register, and when the charge was made to plaintiff she went with him to the register and demonstrated that he was mistaken. He himself admitted the fact to be true. At the time he made the charge against plaintiff complained of in this suit, he held in his hand a receipt for the weekly rental due from her and $20, which was the balance of her weekly salary. This receipt was evidently prepared before he examined the register and claimed to have found $30 or $20 missing; he first stated one sum and then the other. Usually this weekly settlement with appellee was paid at the close of business on Saturday evening, and it is not an unreasonable inference from these facts that for some reason he had determined to discharge appellee before he examined the register and claimed that money was missing therefrom.

There were two trials of the case in the court below. On the first trial appellant testified as follows:

"Q. Do you think she took $20? A. I don't think it at all. I don't think she did.

"Q. Mr. Koehler, if you don't think so, I want to ask you why you used the language you did to her on the occasion you did discharge her from your employment. A. Well, I couldn't help it. * * *

"Q. I am asking you, don't you know that she did not betray your confidence? A. No, sir; she didn't betray my confidence.

"Weren't her accounts accurately kept? A. Her accounts were all right.

"Q. Didn't she account to you for every cent she took in? A. Yes, sir."

[3-5] His testimony on the present trial contains many contradictory statements and could not have impressed the jury with either its accuracy or candor. We think, when all these facts and circumstances are considered, the jury were fully justified in concluding the false statements made by appellant charging plaintiff with taking money from his cash register were not made in good faith. This being so, such statements could have no privileged character, and the language used being per se defamatory, malice will be presumed from the publication of the statements.

[6-8] We here advert to one of the minor complaints presented in appellant's brief which predicates error upon the ruling of the trial court in permitting appellee to testify, over appellant's objection, that she understood the meaning of appellant's language to "brand me as a thief." It is true, as contended by appellant, that it is ordinarily in this class of cases the province of the jury to determine the meaning of the language used, and in determining this question the test is what construction would be placed upon the language by the average person or the general public, and not the construction placed upon it by the plaintiff. We are of opinion, however, that the language used by the defendant cannot be reasonably construed as having any other meaning than that given it by plaintiff, and the testimony complained of must be considered harmless.

We come next to the question of whether the evidence is sufficient to sustain the finding of the jury that in making the false charge against plaintiff the defendant was actuated by existing malice. In submitting this issue to the jury the trial court gave the following instructions:

"By the word 'malice' in the court's charge is meant actual or express malice existing as a fact at the time of the communication, and which prompted or inspired the communication, and means making an accusation against another which the party making the accusation does not believe to be true and makes same from a motive of personal spite, ill will, or hatred, and with gross indifference to the rights of the other amounting to a willful act.

"Malice is not required to be proved by direct evidence and may be established from facts and circumstances in evidence, but must be

proved by evidence other than the falsity of the accusation, and cannot be established alone from the vehemence of the language used or the manner of making same, or tone of voice in which made, nor from the fact 'that defendant had no reasonable grounds for believing the accusation to be true, if in fact he did believe same to be true."

[9, 10] No objection is made to this charge, and we think it sufficiently informed the jury as to what facts were required to be shown to justify the finding that the accusation against plaintiff was maliciously made by the defendant. The existence of an evil intent can seldom if ever be shown by direct evidence, and evidence of facts and circumstances from which it is reasonably inferable is sufficient to show its existence.

The evidence which we have before set out justified the finding by the jury that the defendant knowingly published a false and defamatory charge against plaintiff, which he did not believe to be true at the time of its publication. In making such publication he showed such gross indifference to plaintiff's rights as to warrant the conclusion that his act was willful and inspired by a desire to injure plaintiff. Behee v. Ry. Co., 71 Tex. 429, 9 S. W. 449; Ry. Co. v. McArthur, 31 Tex. Civ. App. 205, 72 S. W. 76; Ry. Co. v. Edmundson (Tex. Com. App.) 222 S. W. 183, 184; Vacicek v. Trojach (Tex. Civ. App.) 226 S. W. 505. We are not required to determine the cause of his animosity to plaintiff which prompted his wrongful treatment of her, and to speculate on this question is unnecessary and probably unprofitable. We are, however, constrained to remark that we are not impressed with plaintiff's theory that her bad health and consequent inability to serve defendant during the last year of her employment with her former efficiency could have caused the ill will which prompted defendant to make the false charge against her. It seems to us that another cause of defendant's animosity appears upon the face of the pleadings and evidence. He testified that he had been frequently told by others that some one was taking his money. He pleaded that plaintiff had acquired an automobile and had a residence in her name in the city of Houston, the value of which was much greater than her financial ability measured by her salary would justify her owning. It is more than likely that the gossip to which he referred and the value of the property apparently purchased and owned by plaintiff produced in his mind a suspicion which he harbored until it produced the curse of ill will which prompted him to make the false charge against plaintiff. The evidence fully explains the means by which plaintiff acquired the property which aroused defendant's suspicion and caused the gossip referred to by him, and shows that such suspicion was wholly unwarranted.

[11] We cannot agree with appellant's contention that the amount of damages found by the jury is so excessive as to authorize this court to disregard the verdict on this issue.

As to the mental and physical suffering caused plaintiff by defendant's conduct and language and the effect upon her health, she testified:

"Mr. Koehler's words spoken to me and his conduct towards me, after that, caused my life to be a living death. That is the best definition I can give as to the effect it had on me. At that' time I hardly knew what to do. I didn't want to go home, because I was so nervous and heart broken. I had never before in my life been accused of stealing anything. I understood by the language used towards me, and his conduct towards me at the time, that Mr. Koehler meant to brand me as a thief. That had all kinds of effect on my health. I am very nervous and hysterical now; and at night when I try to sleep I can see him throw out his hands at me like he did that day, and I just jump, and it awakens me, and then I have to sit up all night, and am so nervous. When I doze off I can see him throw his hands out at me as he did that day.

"After I left the store that afternoon, I wandered the streets a long time and finally stopped at the Union Depot and sank down in one of those chairs in the rest room, and I don't know how long I stayed there. The reason I did that was I was hysterical and nervous and thought that my life was in danger. * * * After leaving the Union Depot I landed at home; that is where I got. It was dark when I got home. That was in the month of August. (Plaintiff had left the store at 2 or 3 o'clock.) When I got to the house, my mother was waiting for me on the gallery; she knew that something was wrong with me. When I got there, she opened the screen door, and I fell right in on the floor, because I was so hysterical and nervous from what Mr. Koehler had accused me of. After I fell, as I have stated, they picked me up and put me in bed, and undressed me and tried to talk to me, and I just couldn't talk to them. I remained in bed then for four days—from Staturday until Thursday.

"It was in 1920 that this occurred, and I have never recovered from the shock that I received. My health now, as compared to what it was before then, is bad and getting worse all the time. I have not sought any other position since that occurrence. The reason I have not tried to get any work is because I have not been able to work at all since this happened, as my health is very bad. I am not working now, and haven't worked for any one at all since this happened. All I have done is, I just tried to help my brother out, and I couldn't stand it and would break down and go home. My brother is a baker, his place of business being out on Louisiana street. * * *

"When I wandered the streets, I didn't know where I went. I have said I did not know where I went when I left the store; I wandered the streets. I do remember getting to the Union Depot and sitting in a chair there. I also recall falling in the door when I got home. I do not remember going to the depot direct from Mr. Koehler's store. I know that I wandered and I was excited. The reason I do not remember all those things is because

I was too nervous and bewildered. I was nervous and I went every which way. I went down all the streets. I did state that I was sick when I got home. I did not have a doctor. Mother wanted to get a doctor for me, but I did not get one. I didn't get a doctor because I did not need one for that trouble. I was sick four days thereafter, and in bed. I did not have a doctor during those four days, and I didn't eat anything either."

Her mother testified:

"I telephoned to the store twice about her because I wanted to know where she was, as she had not come home. A lady answered the 'phone and told me not to worry; that Anna would be home. When Anna got home that evening, she fell right in the doorway; she fell in a faint, and I had to carry her to bed. Anna stayed in bed then from Saturday until the following Thursday. She did not eat or drink anything during that time, but I forced her to take a little milk. During the time she remained in bed as I testified about, she was continually crying, keeping her mouth shut, and taking nothing. Anna did not want a doctor. Since the 21st of August, 1920, when Anna came home that night, her health has been bad ever since; she has been continually worrying."

Her brother testified:

"I do know the time that my sister ceased employment at Mr Koehler's store. I can tell the jury what the condition her health was after that time in comparison with that it was prior to that time, her general physical and mental condition. It was mighty bad. It started going worse from that time on, and she has been sick several times, and many times she has been in an awful bad shape. It was about four or five or six days after my sister ceased to work for Mr. Koehler that I knew anything about their trouble. After she left Mr. Koehler's employment, my sister was lying around the room on the bed and crying. Every time I came home she was in bed crying. I asked her several times what was the matter with her, but she wouldn't say, and finally my mother told me what was the matter with her. My sister has not worked anywhere since the time she quit Mr. Koehler's store, except she has been trying to help me; but she is not much able. She has been around there attending to the store and handling things like that, but she is not able. She fainted last week one day."

There was other testimony corroborative of that above set out. There was testimony contradictory of plaintiff's statements of the general condition of her health since her discharge by the defendant; but taking the evidence as a whole we cannot say that the amount fixed by the jury as actual damage is so excessive as to justify the conclusion that in fixing such amount the jury acted from passion or prejudice or any improper motive, or were not exercising their fair and impartial judgment as to what sum would reasonably compensate plaintiff for the injury sustained by her.

[12] This is also true as to the exemplary damages found by the jury, except that such damages are not measured by the rule of fair compensation but of just punishment. It has always seemed to the writer to be illogical and impolitic to permit a plaintiff in actions of this character to recover exemplary damages. When such damages are assessed, it should be for the benefit of a public charity or other public purposes, and not to give extra compensation for private injury. But the law is well settled otherwise, and as we cannot hold under the facts of this case that the amount of exemplary damages fixed by the jury is unjust and unreasonable, we cannot set aside the verdict on this issue.

It would serve no useful purpose and would unnecessarily add to the length of this opinion to discuss the remaining propositions presented by appellant. It is sufficient to say that all of them have been duly considered, and we find nothing in any of them which requires or would authorize a reversal of the judgment.

We are of opinion that the judgment of the court below should be affirmed, and it has been so ordered.

Affirmed.

GRAVES, J., not sitting.