## HOUSTON PRINTING CO. v. JONES.[*]
### (No. 8689.)

(Court of Civil Appeals of Texas. Galveston.
Dec. 17, 1925. Rehearing Denied
Feb. 25, 1926.)

**1. Libel and slander ⟲9(1)—Interoffice memorandum, posted on bulletin board in newspaper editorial room, held libelous, as justifying innuendo by ordinary reader that plaintiff was worthless on newspaper staff and inaccurate reporter.**

An interoffice memorandum, posted on bulletin board of newspaper editorial room and signed by managing editor, stating that "the most worthless thing on a news staff is an inaccurate reporter," that "this is aptly illustrated in" certain issue by misspelling of name, and that "I want the man who handled the story, Mr. Jones, dismissed," *held* libelous, as justifying innuendo by ordinary reader that person named was a worthless thing on a news staff and an inaccurate reporter.

**2. Libel and slander ⟲112(2)—Evidence sufficient, through inferences and circumstances, to raise issue for jury, meets burden of proving actual malice.**

In action against newspaper publisher for libel in interoffice memorandum, posted on bulletin board of editorial room, stating that plaintiff was a worthless thing on a news staff and an inaccurate reporter, as illustrated in misspelling of name in story handled by him, plaintiff's evidence *held* to meet burden of proving actual malice as sufficient, through inferences and circumstances, to raise such issue for jury; neither direct nor external evidence being indispensable.

---

**3. Appeal and error ☞1003—There is material difference between question presented, as to whether evidence was sufficient to raise issue for jury, and question not presented, as to whether verdict is so against weight of evidence as to be clearly wrong, but appellate court can only determine former.** ·

There is material difference between question presented, as to whether evidence was sufficient to raise issue of fact for jury, and question whether verdict thereon is so against its weight and preponderance as to be clearly wrong; but, latter inquiry not being presented, appellate court may only determine former.

**4. Corporations ☞423 — To render printing company liable for libel in writing posted on editorial bulletin board by managing editor for advancement of office discipline, proof of publication or ratification thereof by it through actual malice was unnecessary.**

Where libelous communication was posted on newspaper bulletin board by managing editor for maintenance and advancement of newspaper's office discipline, and· claim for exemplary damages was eliminated, it was not necessary, to render printing company liable, to show that it published or ratified publication of writing through actual malice.

**5. Libel and slander ☞123(9)—Statement of facts and evidence held of warrant submission of question of actual damage to jury.**

In action against newspaper publisher for libel in memorandum, posted in editorial room, stating that plaintiff was worthless reporter, statement of facts and evidence *held* to warrant submission of question of actual damage to jury.

Appeal from District Court, Harris County; Chas. E. Ashe, Judge.

Action by A. F. Jones against the Houston Printing Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Baker, Botts, Parker & Garwood, Palmer Hutcheson, and Barksdale Stevens, all of Houston, for appellant.

Woods, King & John, of Houston, for appellee.

GRAVES, J. This statement, only· amended so as to include the questions asked and the responses made, in place of its résumé of both, is taken from appellant's brief, the appellee having accepted it as correct:

"On September 8, 1924, A. F. Jones, a discharged reporter of his former employer, the appellant herein, Houston Printing Company, filed a petition in the district court of Harris county, Tex., seeking to recover damages for an alleged libel, which is hereinafter copied. In substance, this libel was an interoffice memorandum, posted on the bulletin board of appellant's editorial room. The bulletin was signed by L. A. Hoskins, the then managing editor of appellant.

"Appellee alleged that by innuendo the language used meant that he, appellee, was a worthless thing, and that he was an inaccurate reporter, that the particular inaccuracy of

which appellee was admittedly guilty was but a single instance out of many, and further that appellee had always .been engaged in newspaper reporting, and that in all the years of his experience he had always been uniformly accurate, and that the publication was made by appellant for the purpose of injuring, humiliating, and offending appellee, and was done maliciously, and that the publication tended to injure appellee's reputation, and to expose him to public hatred, contempt, and ridicule, and to financial damage in the sum of $25,000 actual damages and $20,000 exemplary damages. It may be noted that on the trial appellee waived any exemplary damages, and no issue was submitted thereon.

"The bulletin complained of read as follows:

" 'The Houston Post.

" 'Interoffice Correspondence.

" 'Date: July 18, 1921.

" 'Subject: Inaccuracy.

" 'Mr. Hunter: The most worthless thing on a news staff is an inaccurate reporter. This is aptly illustrated in Monday morning's issue . of the Post in connection with the death of Lee C. Ayars. The, misspelling of Mr. Ayars' name not only made the Post look foolish, but offended the family and friends of the deceased. As an example and a warning, I want the man who handled the story, Mr. Jones, dismissed. I want every member of your staff to know that he was dismissed, and that other dismissals will follow for similar cause.

" '[Signed] L. A. Hoskins.'

"To the petition the appellant answered by general demurrer, general denial, and special plea of the truth of the statements contained in the interoffice memorandum, and special plea that the communication and its publication by the appellant was privileged, and that the appellant acted in good .faith and with no other intent, or feeling, or purpose. The appellant's request for peremptory ·instruction was overruled by the trial judge, who submitted the case to the jury on special issues, which, together with the jury's answers thereto, were as follows:

" 'No. 1. Was the writing made by L. A. Hoskins, and caused by him to be posted, of and concerning plaintiff, couched in language defamatory of plaintiff? Yes.

" 'No. 2. Was the said L. A. Hoskins actuated in whole or in part by actual malice, as that term has been herein defined, toward plaintiff, in making and causing to. be posted said writing? Yes.

" 'No. 3. Did the· posting of the writing, as it referred to plaintiff, tend to the prejudice or injury of the reputation, if any, of plaintiff in his profession, trade, or business as a newspaper man, and thereby tend to expose plaintiff to public hatred, contempt, or ridicule, as those terms have been herein defined? Yes.

" 'No. 4. Was the entire contents of the writing, referring to plaintiff, so posted on July 18, 1921, substantially true? No.

" 'No. 5. What sum of money, if paid now, would reasonably compensate plaintiff for the injury done him, if any, taking into consideration the following elements, and no others: (a) Injury, if any, to plaintiff in his trade, profession, or business as a newspaper man; (b)

injury, if any, caused by damage to plaintiff's character or reputation through public hatred, contempt, or ridicule, if any, as those terms are herein defined.   $1,000.00.'

"On these findings the trial court entered a judgment in favor of appellee against appellant for $1,000, to which judgment appellant excepted, and gave notice of appeal; motion for new trial having been overruled."

Appellant's sole presentment to this court is that its request below for a peremptory instruction in its favor should have been granted, basing the contention upon these seven propositions:

"First. The undisputed evidence shows that the interoffice memorandum upon which appellee bases his suit was a qualifiedly privileged communication because it was published by the managing editor in the course of the discharge of his duties to the employés under his control and in reference to which he had a duty to perform and the recipients of the communication had an interest therein.

"Second. The undisputed testimony showing that the communication made the basis of this case being qualifiedly privileged, the burden of proof was on the appellee of proving the existence of actual malice on the part of the writer of the communication, L. A. Hoskins, at the time of the publication of the communication, and the evidence was wholly insufficient to establish such actual malice, and the trial court therefore should have peremptorily charged the jury for the appellant.

"Third. The overwhelming weight and preponderance of the evidence having established the truth of the statements of fact contained in the communication, the court erred in submitting the case to the jury, and erred in not granting appellant's request for a peremptory instruction to return a verdict in favor of appellant.

"Fourth. The language in the interoffice memorandum is clear and unambiguous, and its meaning cannot be distorted, enlarged, or added to·by innuendo, and such language does not sustain the innuendoes pleaded in appellee's petition, and is not libelous, and the court erred in not granting the request of appellant for a peremptory instruction.

"Fifth. The appellant being a corporation, there was no proof that the communication was published through actual malice of any authorized official of the corporation, nor was there any proof of ratification by any of such authorized officials, and the trial court therefore erred in overruling appellant's request for a peremptory instruction.

"Sixth. The law imposed on appellee the burden of proof of showing actual malice toward him at the time of the publication by Mr. Hoskins, and that such actual malice was the motive for the publication, and this actual malice cannot be inferred from the language of the publication, and the appellee failed to discharge the burden of proof imposed on him by law, for that the evidence adduced on the trial is as equally consistent with the absence of such malice as it is consistent with the presence of such malice, and by reason of such failure the trial court should not have submitted the case to the jury, but should have granted appellant's request for peremptory instruction, and

should have peremptorily instructed the jury to return a verdict for appellant.

"Seventh. The trial court should have peremptorily instructed the jury to return a verdict for the defendant, on the ground that no actual damage had been proved, and the finding of the jury to the effect that plaintiff was actually damaged in the sum of $1,000 is unsupported by the testimony."

So that, no question being raised as to the character or form of the issues, nor any as to the weight of the evidence as affording support for the verdict, inclusive of the fixing of the amount of damages, the appeal must fail, unless it can be held as a matter of law that the evidence for the plaintiff below (appellee here), considered in its most favorable light, by giving it the benefit of every reasonable inference of fact, was insufficient to even raise any issue for the jury, and that the trial court therefore erred in submitting the cause to them at all.   Williams v. Railway, 165 S. W. 788, 257 Mo. 87, 52 L. R. A. (N. S.) 451, 452.

We cannot so hold.   Preliminarily, it may not be amiss to note the elimination of some collateral and contributing considerations, which the ability, candor, and helpfulness of counsel for both parties has made possible. For instance, they agree: (1) That the test as to defamatory language, where it is susceptible of that meaning, is "not so much the idea which the speaker or writer intends to convey, as what he does in fact convey.   It is the effect upon the character of the person alleged to be defamed by the utterance which the law considers, and therefore the utterer uses the language at his peril."   Chronicle v. Thomas (Tex. Civ. App.) 262 S. W. 246.   (2) That the office of an innuendo is to explain what has already been expressed and show the application thereof, not to change the natural import of plain and unambiguous language, by enlarging, adding to, or distorting the sense of it.   Chronicle v. Thomas, supra;  Guisti v. Tribune, 150 S. W. 874, 152 S. W. 167, 105 Tex. 506;  Belo v. Looney (Tex. Civ. App.) 246 S. W. 769;  Plummer v. Tribune, 270 S. W. 793, 208 Ky. 210;  Gustin v. Evening Press, 137 N. W. 674, 172 Mich. 311, Ann. Cas. 1914D, 95;  Hayes v. Press Co., 18 A. 331, 127 Pa. 642, 5 L. R. A. 645, 14 Am. St. Rep. 874.   (3) That this communication was qualifiedly privileged, and that the burden was upon the appellee to establish actual malice on the part of the writer of it, Mr. Hoskins.   I. & G. N. v. Edmundson (Tex. Com. App.) 222 S. W. 181;  B. E. Lee v. M. P. R. Co., 71 Tex. 428;  Koehler v. Sircovich (Tex. Civ. App.) 269 S. W. 812;  Newell on Libel and Slander (3d Ed.) pp. 477–482, 578.

[1] The mutual concession of these principles narrows considerably the task of this court.   Logically, its first inquiry has seemed to be to determine whether or not, conformably to them, the language used was properly susceptible of the meaning attributed to it by

the material substance of the innuendo alleged; that is, that the appellee was a worthless thing on a news staff, an inaccurate reporter, and that this fact was aptly illustrated in his misspelling of Mr. Ayars' name in Monday morning's issue of the Post. To ask the question seems to us to answer it in the affirmative. However good the intention of Mr. Hoskins, and whatever meaning he meant to convey, that his actual words were reasonably calculated, in the circumstances used, to convey this idea to the mind of the ordinary reader, admits, we think, of no very serious doubt.

While the preamble is labeled "inaccuracy," the communication is not an abstract dissertation upon what a worthless thing that failing is; rather it at once descends to the concrete, by applying the characterization to *a reporter on a news staff,* and to the personal by designating *Mr. Jones as that reporter.* Disassociated from him individually, it practically is denuded of any meaning at all. No disembodied precept was being lectured upon, but the pointing of a moral was being indulged in by instancing as an improper example the plainly imputed charge that Mr. Jones was inaccurate as a news reporter. As before indicated, the question is what effect the publication would have upon the mind of the ordinary member of the public who might read it, and that it would there receive the same construction we have placed upon it seems not to call for extended argument. The innuendo was therefore justified, and the writing libelous, within the meaning of the authorities cited supra.

This conclusion not only directly disposes of appellant's fourth proposition adversely, but also indirectly of its third, since there is no contention that the truth of the innuendo was established, nor could there well be under the undisputed proof that Mr. Jones had always been prior to this incident, both a valuable and an accurate news reporter.

[2] The second question presenting itself is: Did the appellee meet the burden of proof resting upon him as to actual malice on the part of Mr. Hoskins? More difficulty has been encountered here; but, since neither direct nor external evidence is indispensable, and, in the condition of the record upon appeal, a finding that on the whole he adduced enough through inferences and circumstances, intrinsic as well as extrinsic, to merely raise that issue for the jury, is sufficient, we conclude that he did.

[3] There is a material difference between the questions presented to a Court of Civil Appeals of whether the evidence was sufficient to simply raise an issue of fact for a jury and whether a verdict thereon is so against its weight and preponderance as to be clearly wrong. If the latter of these inquiries had been presented here, it may be that this court in the exercise of its exclusive province in that situation would have set the verdict aside; but, since it has not been, it is only proper for us to determine what is before us, the former.

While it is true that the presumption of good faith obtains as to privileged communications, thereby making it incumbent upon a plaintiff to rebut it, the rule as to how he may do so is thus stated by our Supreme Court, through the Commission of Appeals, in the recent case of I. & G. N. v. Edmundson, 222 S. W. supra, at pages 183, 184:

"The malice which avoids the privilege is actual or express malice, existing as a fact at the time of the communication, and which inspired or colored it. Such malice exists where one casts an imputation which he does not believe to be true, or where the communication is actuated by some sinister or corrupt motive, or motives of personal spite or ill will, or where the communication is made with such gross indifference to the rights of others as will amount to a willful or wanton act. Bradstreet Co. v. Gill, supra; Jackson v. Hopperton, 16 C. B. (N. S.) 829; 18 Halsbury, Laws of England, § 1316. Actual or express malice need not be proven by direct or extrinsic evidence. It may be inferred from the relation of the parties, the circumstances attending the publication, the terms of the publication itself, and from the words or acts of the defendant before, at, or after the time of the communication; but it must be evidence from which the jury may infer malice existing at the time of publication and actuating it. Gassett v. Gilbert, 6 Gray (Mass.) 94; Jackson v. Hopperton, supra; 18 Halsbury, Laws of England, §§ 1304, 1316."

The inferences and circumstances indicated and testified to here, other than the established falsity of the imputed charge, which we have held to be the inherent essence of the language used, tending to raise in the minds of the jurors the question as to whether Mr. Hoskins was at the time actuated by the kind of malice thus defined, may fairly be epitomized in this way: (1) That there was needless severity in the language used, the offense being the mere misspelling of one letter in a proper name; (2) that the posting of it in writing from April 18th to late in December, 1921, on a semipublic bulletin board in a newspaper office, to which the general public—and particularly the representatives of other newspapers—had access, and at least on occasions went, gave it both an unnecessary and an unduly long publicity; (3) the fact that the appellee alone was singled out for discharge for this one slip of the pen, while others similarly situated and equally guilty, both before and after his misfortune, were neither discharged nor posted; (4) the fact that Mr. Hoskins had, some four or five weeks prior to this occurrence, decidedly changed his manner toward the appellee from cordial to cool, practically ceasing to speak to him; (5) the fact that Hoskins and his city editor, shortly prior to the discharge,

had discussed the appellee as being disappointing in his work, and that in later ordering the discharge, he told this subordinate it was necessary, both because they could not get along with the appellee any longer, and for an example, thereby disclosing a personal motive; (6) the fact that, of all the persons discharged under Mr. Hoskins' régime, for whatever cause (and there were several of them), the appellee was the only one against whom that fact was posted on the bulletin board at all; (7) the fact that this charge and imputation against Mr. Jones of being inaccurate was known by Mr. Hoskins at that time to be untrue.

The substance of each and all of these matters was either directly testified to, or constituted a reasonable inference from what was in evidence. Taken together, they were sufficient, we think, to make a jury question out of the state and effect of Mr. Hoskins' personal feeling toward the appellee in the ordering of this publication. The whole is not only equal to the sum of its parts, as the mathematical theorem has it, but with reference to evidentiary details, as was said by the Supreme Court of the United States in Railway v. Hadley, 38 S. Ct. 319, 246 U. S. 332 (62 L. Ed. 755):

"On the question of its negligence, the defendant undertook to split up the charge into items mentioned in the declaration as constituent elements, and to ask a ruling as to each. But the whole may be greater than the sum of its parts, and the court was justified in leaving the general question to the jury, if it thought that the defendant should not be allowed to take the bundle apart and break the sticks separately, and if the defendant's conduct, viewed as a whole, warranted a finding of neglect. Upon that point there can be no question."

In addition to those hereinbefore cited, we think this view finds support in these opinions: Kruse v. Rabe, 79 A. 316, 80 N. J. Law, 378, 33 L. R. A. (N. S.) 469, Ann. Cas. 1912A, 477; Sullivan v. Com. Co., 53 S. W. 912, 152 Mo. 268, 47 L. R. A. 862; Behee v. Railroad Co., 9 S. W. 449, 71 Tex. 428; Koehlerr v. Sircovich (Tex. Civ. App.) 269 S. W. 817. Under the principles applied in these cases, it cannot be held that the context of this writing, together with the manner and method of its publication in the circumstances obtaining —inclusive of whatever personal feeling appellant's agent in its visitation, Mr. Hoskins, may have had toward the appellee in the matter—were conclusively shown to be merely commensurate with the exigencies of the occasion, as counsel for appellant so ably argue; upon the contrary, the needful requirements appear to have been exceeded. The appellant was a newspaper of general circulation; its very business was that of a purveyor of publicity, and as such the members of the general public were attracted to its editorial office, where this writing about its hitherto admit-

tedly capable and accurate news gatherer was so conspicuously and so long displayed. The undisputed testimony was that the room was a large one, bearing no indication of privacy, and housing a number of departments, those of the managing editor, of the private branch exchange operator, the sporting editor, the various reporters, the copy readers, and of the telegraph editor, and, further, to quote from the statement of facts:

"And other people visit there, besides employees of the paper. Any one could come in there who wanted to; there wasn't anything to keep them out. On election nights there would be lots of people there, finding out about election returns, and, of course, the men that were interested in baseball or wrestling were up there with Mr. Anderson. They all had access to that room. Visiting newspaper men from other cities could come in there when they wanted to. There was nothing to prevent people who came into that room (not employees of the Post) from observing this bulletin board. It was there on the wall. Other employees of the Post than those engaged in reporting visited that room; the copy readers were there, and they were not reporters, and the Sporting Editor was there, and sometimes people would come up from other departments on business of various kinds."

The appellee himself testified:

"A man on the street told me of it. That man was not connected with the Houston Post in any way, and I don't know what business he was engaged in at that time, but his profession was a newspaper man. His name, as I remember it, was Schrader or Schroeder, and he was not connected with the Houston Post. From what he told me I made an investigation, to see if this was posted on the bulletin board. The same day he told me about it, I went up to the post office and looked on the bulletin board, where he said it was posted, and I found there a verbatim copy of this letter. * * * In this conversation with this man Schrader, he dwelt on the point of how I had been shown up to be incompetent as a newspaper man, and he said it in a way that, to me, was very significant of sarcasm. * * * A great many other people have discussed this thing with me, and the construction they put on it. I have talked to very, very few about it, but I have been approached by a number."

The rule of law applicable in such circumstances is thus stated by the court of last resort in New Jersey in Kruse v. Rabe, supra:

"It is true that she was entitled to consult him and he was entitled to advise her with entire freedom, so long as he did so honestly. But it cannot be said that a lawyer may shout to his client in a public place advice that a party with whom the client has been dealing has taken advantage of him, and claim immunity under the plea of privilege. The rule is thus stated in Odgers, Lib. & S. 245: 'If the words be spoken in the presence of strangers wholly uninterested in the matter, the communication loses all privilege. The defendant in these cases must be careful that his words reach only those who are concerned to hear them. Words of admonition or confidential ad-

vice should be given privately, not shouted across the street, or written on postcards, or published in the newspapers. * * * It is true that the accidental presence of some third person will not alone take the case out of the privilege, if it was unavoidable or happened in the usual course of business affairs. But if the defendant purposely contrives that a stranger should be present, and who, in a natural course of things, would not be present, all privilege is lost. * * * And whenever a defendant deliberately adopts a method of communication which gives unnecessary publicity to statements defamatory of plaintiff, the jury will be apt to infer malice.' "

Obviously, to merely accomplish a discharge and to reach the reportorial staff with such deterrent influence as that fact, along with the cause of it, might have, it was not necessary to so post for nearly six months' time this defamatory statement about the appellee; a simple verbal notice of his discharge, both to himself and all the other reporters, for misspelling Mr. Ayars' name, or a letter of the same purport to him, with a carbon copy to each of the others, or even the publication of such a moderate statement on the bulletin board for a reasonable time, would seem to have been sufficient.

Under these deductions, the second proposition falls, and with it the sixth, which in practical effect is a corollary to it. If, as has been determined, it was only necessary to raise an issue of actual malice as actuating the publication on Mr. Hoskins' part, and the testimony was sufficient to properly do that, it could not be that "the evidence adduced on the trial is as equally consistent with the absence of such malice as it is consistent with the presence of such malice." Such an even balancing of the scales does not raise an issue. If, as the proposition seems to imply, there was no preponderance either way, and the testimony as to whether or not there was actual malice was so uncertain as to furnish no satisfactory basis for a conclusion either that it did or did not exist, it may be conceded there was a failure of proof; but that is not our finding. In holding that there was an issue for the jury on the question, we have determined that the circumstances established a reasonable ground for the inference that it did exist, and that is sufficient, even though the inference may not be a necessary one. 23 Corpus Juris, pp. 54, 55; Hobbs v. Petterson (C. C. A.) 2 F.(2d) 594; Wigmore on Evidence (2d Ed.) p. 253, § 38; Railway v. Moss (Tex. Civ. App.) 203 S. W. 777. This conclusion rests upon a consideration of plaintiff's evidence alone, not upon the entire evidence, after that in contradiction had been added by the defendant.

[4] The fifth contention, to the effect that no authorized official of appellant, a corporation, was shown to have either published, or ratified the publication of, this writing through actual malice, wherefore such malice, if shown, was not imputable to the corporation, is, we think, not tenable. In a case like this, no such direct participation in the malice by the principal, originally or by subsequent ratification, seems to be necessary under the decisions of the Supreme Court of the United States. Here the claim for exemplary damages had been eliminated; the communication was posted on the corporation's bulletin board by its managing editor, for what it herein affirmatively pleads was its own benefit—the maintenance and advancement of its office discipline. That court, in Railway v. Prentice, 13 S. Ct. 264, 147 U. S. 109 et seq., 37 L. Ed. 102, 103, thus declared the law upon the question:

"A corporation is doubtless liable, like an individual, to make compensation for any tort committed by an agent in the course of his employment, although the act is done wantonly and recklessly, or against the express orders of the principal [citing cases]. A corporation may even be held liable for a libel, or a malicious prosecution, by its agent within the scope of his employment; and the malice necessary to support either action, if proved in the agent, may be imputed to the corporation [citing cases]. But, as well observed by Mr. Justice Field, now Chief Justice of Massachusetts: 'The logical difficulty of imputing the actual malice or fraud of an agent to his principal is perhaps less when the principal is a person than when it is a corporation; still the foundation of the imputation is not that it is inferred that the principal actually participated in the malice or fraud, but, the act having been done for his benefit by his agent, acting within the scope of his employment in his business, it is just that he should be held responsible for it in damages.' Lothrop v. Adams, 133 Mass. 471, 480, 481 [43 Am. Rep. 528]."

[5] The first proposition, standing alone, being inconclusive, as well as having been in substance conceded by the adverse litigant, there but remains for consideration the seventh. Since appellant's assignment is—not that the recovery was excessive—but only that there was no evidence of damage at all, it is determined the other way in Mayo v. Goldman, 122 S. W. 449, 57 Tex. Civ. App. 475, where the court in substance declares:

"Words which affect a person injuriously in his * * * occupation are actionable per se. * * * He is entitled to recover at least nominal damages, if the speaking thereof is not privileged, and if the imputation they convey is false."

Furthermore, in view of the statement of facts and the testimony upon that feature there appearing, it cannot be said as a matter of law that no actual damage was shown. From these conclusions it follows that the trial court's judgment should be affirmed: that order has been entered.

Affirmed.