**Grady SIMMONS, Appellant,**

v.

**Travis WARE, Individually and as District Attorney, and David Mullin, Appellees.**

**No. 07–95–0296–CV.**

Court of Appeals of Texas, Amarillo.

March 26, 1996.

David L. Holder and Floyd D. Holder, Jr., Lubbock, for appellant.

Shelton & Jones, Travis D. Shelton, Dale Jones, Lubbock, Sprouse, Mozola, Smith & Rowley, Mark D. White, Lee Ann Reno, Amarillo, for appellees.

Before REYNOLDS, C.J., and DODSON and BOYD, JJ.

BOYD, Justice.

In three points, appellant Grady Simmons contends the trial court erred in entering a take-nothing summary judgment in favor of appellees Travis Ware and David Mullin. In those three points, he contends material fact questions exist which prevent the granting of summary judgment. The underlying suit is one alleging libel and slander and arises out of a complicated set of facts which we will detail as necessary to discuss and dispose of the points of error. In the course of that discussion, we will explain why we affirm the judgment of the trial court.

In October 1992, an attorney was indicted in Randall County for witness tampering in a capital murder case. Two Lubbock County police officers, William Hubbard and Patrick Kelly, were called to testify on behalf of the defendant in that case. In the course of their testimony, the officers made allegations of misconduct by State pathologist Dr. Ralph Erdmann, Randall Sherrod, who was Randall County District Attorney at the time, and Travis Ware, who was Lubbock County District Attorney at the time.

On October 21, 1992, Hubbard was indicted in Lubbock County for an offense unrelated to the Randall County capital murder proceedings. On November 18, 1992, Kelly was indicted in Randall County for allegedly committing perjury in the Randall County trial. Contending the indictments against them were obtained in retaliation for the exercise of their constitutional right and obligation to testify truthfully, Hubbard and Kelly then sought an injunction in an Amarillo federal court seeking to enjoin the prosecutions against them. Finding the officers' allegations were correct, the federal court granted a preliminary injunction enjoining the further pursuit of the State court prosecutions. The case was eventually settled.

Simmons was a newspaper reporter employed by the *Lubbock Avalanche Journal.* Mullin was Ware's attorney in the suit in Amarillo federal district court in which the officers obtained the preliminary injunction. In the instant suit, Simmons alleged that on or about July 27, 1993, Mullin wrote a letter to the editor of the *Avalanche Journal* in which Mullin "blamed everyone but his client for the lawsuit and its outcome. He never acknowledged that it is an abuse of power to use that power to retaliate against people for the exercise of their constitutional rights." Simmons also alleged the letter, *inter alia,* contained defamatory material about him such as:

A. ... It states that Assistant District Attorney Trey Hill testified by affidavit that he saw "AJ reporter Grady Simmons drinking a toast to the castration of Travis Ware." This statement is untrue—the affidavit of Trey Hill did not state nor suggest that Grady Simmons joined in the said toast. Furthermore, Grady Simmons did not drink a toast to the castration of Travis Ware.

B. The statement imputes bias to Grady Simmons and colors his prior reporting of the Amarillo hearings with dishonesty and a hidden agenda to injure Travis Ware.

C. Furthermore, the letter imputes bias to Grady Simmons by placing the term "unbiased" in quotation marks.

Simmons also alleged Ware passed out copies of the letter to individuals and groups, in-

cluding a meeting of the West Texas Home Builders Association. He also asserted a claim under 42 U.S.C. § 1983 (§ 1983 claim) against Ware, relevant to which was an allegation that on or about February 7, 1994, at a "Candidates Forum" held at Texas Tech University:

> TRAVIS WARE told the audience that Plaintiff had reported certain specifc [sic] things about him. Then, as if in answer to the unasked question of whether or not the reports were valid, TRAVIS WARE stated, "Grady Simmons is no longer employed at the *Avalanche Journal.*"

■ While the United States Constitution contains no explicit guarantee of the right to sue for defamation, the Texas Constitution expressly authorizes the bringing of reputational torts.[1] *Casso v. Brand,* 776 S.W.2d 551, 557–58 (Tex.1989). Indeed, the *Brand* court, citing *Dairy Stores Inc. v. Sentinel Publishing Co.,* 104 N.J. 125, 157, 516 A.2d 220, 236 (1986), noted its recognition "that summary judgment practice is particularly well-suited for the determination of libel actions, the fear of which can inhibit comment on matters of public concern." *Casso v. Brand,* 776 S.W.2d at 558.

■ Even though courts must give careful judicial attention to summary judgment motions in the context of the First Amendment, the well established standards for reviewing a summary judgment are just as applicable in defamation cases as in other types of cases. *Id.* at 556. Thus, the movant has the burden of showing there is no genuine issue of material fact and he is entitled to judgment as a matter of law, and, in determining whether there is a disputed material fact issue that precludes summary judgment, evidence favorable to the non-movant will be taken as true, every reasonable inference must be indulged in favor of the non-movant, and any doubts must be resolved in his favor. *Nixon v. Mr. Property Management,* 690 S.W.2d 546, 548–49 (Tex.1985).

■ Where, as here, the judgment is in favor of a defendant, the standard of review is whether the summary judgment proof establishes as a matter of law that there is no genuine issue of fact about one or more essential elements of the plaintiff's cause of action. *McDole v. San Jacinto Methodist Hosp.,* 886 S.W.2d 357 (Tex.App.—Houston [1st Dist.] 1994, no writ), citing *Gibbs v. General Motors Corp.,* 450 S.W.2d 827, 828 (Tex.1970). Parenthetically, our summary judgment procedure permits the granting of a summary judgment on the basis of uncontroverted testimonial evidence of an interested witness if the evidence is "clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted." Tex. R.Civ.P. 166a(c). Additionally, one last consideration in our review is that when a trial court does not specify the ground upon which it based its ruling, the summary judgment will be affirmed on appeal if any of the theories advanced are meritorious. *Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex.1989). It is in the light of these explications that we proceed with our review.

■ Our supreme court has expressly adopted the "defamation" standard set out in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). *Casso v. Brand,* 776 S.W.2d at 557. Thus, to prevail at trial, a plaintiff must show the defendant made a false and defamatory statement of fact without knowledge that it was false or with reckless disregard of whether it was false. *Id.* at 558, citing *New York Times,* 376 U.S. at 279–80, 84 S.Ct. at 726. Whether words are capable of the defamatory meaning the plaintiff attributes to them is a question of law for the court. *Carr v. Brasher,* 776 S.W.2d at 569.

■ In the Texas Civil Practice and Remedies Code [2] (the Code), the elements of libel are described as:

---

**1.** Every person shall be at liberty to speak, write, or publish his opinions on any subject, *being responsible for the abuse of that privilege....*
Tex. Const. art. I, § 8 (emphasis added).
All courts shall be open, and every person for an injury done him, in his lands, goods, person,

or *reputation,* shall have remedy by due course of law.
Tex. Const. art. I, § 13 (emphasis added).

**2.** Tex.Civ.Prac. & Rem.Code § 73.001 (Vernon 1986).

A libel is a defamation expressed in written or other graphic form that tends to blacken the memory of the dead or that tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation or to publish the natural defects of anyone and thereby expose the person to public hatred, ridicule, or financial injury.

By provision of § 73.006 of the Code, it does not affect the existence of common law, statutory, or other defenses to libel. This court has defined slander as an orally communicated or published defamatory statement made to a third person, without legal excuse, which is either defamatory in itself or defamatory because it results in actual damages. *Glenn v. Gidel,* 496 S.W.2d 692, 697 (Tex.Civ.App.—Amarillo 1973, no writ).

 To prevail at trial in either a libel or slander action, the plaintiff must have offered clear and convincing affirmative proof of the asserted libel or slander. *Casso,* 776 S.W.2d at 558. While it is conceivable that a defendant's trial testimony could provide the requisite proof under the rigors of cross-examination, it is more likely that a plaintiff will have to secure such evidence elsewhere, and if he cannot secure it during the discovery process, he is unlikely to stumble on to it at trial. *Id.* at 558–59.

### *LIBEL CLAIM AGAINST MULLIN AND WARE*

In his summary judgment motion, Mullin posited that as a matter of law, the two statements complained of were not defamatory and were substantially true. He also argues that because Simmons was a limited purpose public figure and thereby must prove actual malice, the summary judgment evidence conclusively proved that he, Mullin, did not act with malice.

In his summary judgment motion, Ware claimed that because Simmons was not subjected to public hatred, contempt, ridicule or financial injury, any statements attributed to him were not actionable. As did Mullin, Ware claimed any such statements were substantially true and that Simmons was a limited purpose public figure because his byline identified him to "tens of thousands of readers" and he voluntarily injected himself into this controversy by seeking out criminal defense attorneys, *i.e.,* attending their party where the toast was made. Additionally, Ware claimed Simmons failed to plead and prove Ware published the letter.

 To sustain his defamation claim, Simmons must show that Mullin or Ware "published" defamatory matters about him which injured or impeached his reputation. *Schauer v. Memorial Care Systems,* 856 S.W.2d 437 (Tex.App.—Houston [1st Dist.] 1993, no writ). The "publication" of an allegedly libelous letter requires a showing that the letter was received, read, and understood by a third person. *Putter v. Anderson,* 601 S.W.2d 73, 78 (Tex.Civ.App.—Dallas 1980, writ ref'd n.r.e.), *citing* 50 Am.Jur.2d, *Libel and Slander* § 154 (1970). Because such "publication" need only be a negligent or intentional act that communicates defamatory matter to a person other than the person defamed, *Baubles & Beads v. Louis Vuitton, S.A.,* 766 S.W.2d 377, 380 (Tex.App.—Texarkana 1989, no writ), the failure of the *Avalanche Journal* to actually print Mullin's letter does not preclude a determination that the statements in the letter were "published" within that definition. Mullin's letter was addressed to Jay Harris, the editor of the Lubbock newspaper, and Mullin does not dispute that employees of the newspaper received and read the letter. Additionally, Ware admitted in his deposition that he distributed copies of the letter at the West Texas Home Builders' meeting. Thus, the letter was "published" within the context of a libel proceeding.

 We must next determine whether the statements in the letter were actually defamatory as pled by Simmons. In order to do so, we must examine the letter in its entirety rather than examine separate sentences or excerpts from it. *Schauer,* 856 S.W.2d at 446, *citing Musser v. Smith Protective Serv., Inc.,* 723 S.W.2d 653 (Tex.1987). This is true because statements may be made defamatory by taking them out of context, and although they may be false, abusive,

unpleasant and objectionable to the plaintiff, they may not be "defamatory" in an actionable sense. *Schauer,* 856 S.W.2d at 446.

Simmons first argues the statements are *per se* defamatory because they are aimed at him in his occupation, business, or profession. In doing so, he places primary reliance upon the decisions in *Bradbury v. Scott,* 788 S.W.2d 31 (Tex.App.—Houston [1st Dist.] 1989, writ denied), and *Shearson Lehman Hutton, Inc. v. Tucker,* 806 S.W.2d 914, 920 (Tex.App.—Corpus Christi 1991, writ dism'd w.o.j.). We must then determine whether he is correct in that contention.

In *Bradbury,* corporate majority interest owner Bradbury wrote two letters about Scott, his co-investor, after Scott had resigned her employment with the corporation. In both letters, he accused Scott of lacking fidelity and honesty while she was an employee of their corporation. The first letter was written to the bank that held the corporation's checking account, and the second was addressed to a booster club which was a charitable organization benefiting Friendswood public school activities. In both letters, Bradbury expressly stated that Scott's actions "could be construed as 'illegal and not in the best interest of the corporation,'" and specifically detailed alleged wrongdoing. *Id.* at 34. En route to affirming the jury's verdict in favor of Scott, the appellate court noted that both letters "were libelous *per se* because they accused her [Scott] of conduct that affects a person injuriously in his or her office, profession, or occupation." *Id.* at 38. The court also noted that Bradbury wrote the letter to the bank "knowing that the allegations were not true, but with the apparent intention to recover money from the bank on a banking technicality." *Id.*

In the *Shearson Lehman Hutton* case, the defendant made statements that Tucker, the plaintiff, was going to lose his stockbroker's license, was in big trouble with the Securities and Exchange Commission, and would never work again as a stockbroker. 806 S.W.2d at 921. The court commented that the recipients of the comments regarded the statements as definite, factual and serious and believed Tucker would not work as a stockbroker for another firm. *Id.*

The statements with which we are concerned do not rise to the defamatory level of the statements in *Bradbury,* or *Shearson Lehman Hutton,* or cases of like ilk. They are not sufficient to be defamatory *per se.*

In his deposition, Simmons admitted that criticism of a reporter from both sides of controversial subjects is natural. He described other accusations of being biased or unfair made at or near the time of this event as "... generally a comment a reporter hears from sources and the readers." Although the letter was addressed to the editor of the *Avalanche Journal,* we note it was not an all out attempt to seek termination of Simmons's employment similar to the posted memo in *Houston Printing Co. v. Jones,* 282 S.W. 854 (Tex.Civ.App.—Galveston 1925, writ dism'd w.o.j.).

In the *Houston Printing Co.* case, the court held it is actionable to falsely charge that a newspaper reporter is inaccurate and a worthless person on a newspaper. An interoffice memo signed by the plaintiff's managing editor was posted on the editorial bulletin board. The memo read:

Subject: Inaccuracy

Mr. Hunter: The most worthless thing on a news staff is an inaccurate reporter. This is aptly illustrated in Monday morning's issue of the Post in connection with the death of Lee C. Ayars. The misspelling of Mr. Ayars' name not only made the Post look foolish, but offended the family and friends of the deceased. As an example and a warning, I want the man who handled the story, Mr. Jones, dismissed. I want every member of your staff to know that he was dismissed, and that other dismissals will follow for similar cause.

The court held the evidence was sufficient to raise a fact question for resolution by the jury and in doing so, noted there was needless severity of language used in the memo, it was posted on a semipublic bulletin board to which the general public had access, other employees who had committed similar instances both before and after Jones's story were neither discharged nor posted, there appeared to be a personal motive for the posting, and the managing editor knew that

the plaintiff was not inaccurate. *Id.* at 857–58. In this instant case, Simmons was mentioned by name only once in the letter and the alleged defamatory statements were not sufficient to be defamatory *per se.*

 In determining whether the evidence in this case sufficiently disproves the existence of a fact question as to the defamatory effect of the letter, we must bear in mind the established rule that an expression of opinion is protected free speech. *Schauer,* 856 S.W.2d at 447, *citing Yiamouyiannis v. Thompson,* 764 S.W.2d 338, 340 (Tex.App.—San Antonio 1988, writ denied), *cert. denied,* 493 U.S. 1021, 110 S.Ct. 722, 107 L.Ed.2d 742 (1990). Thus, the next question for our determination is whether the statements in question were merely expressions of opinion or were actionable assertions of fact by Mullin. *Schauer,* 856 S.W.2d at 447; *El Paso Times, Inc. v. Kerr,* 706 S.W.2d 797, 798–800 (Tex.App.—El Paso 1986, writ ref'd n.r.e.), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 761 (1987). That is a question of law to be determined by the court. *Carr v. Brasher,* 776 S.W.2d 567, 570 (Tex.1989).

In his brief, Mullin admits that his statement about Hill's affidavit is an assertion of fact, but argues it is merely "an assertion of fact about what someone else said about Simmons, putting the ordinary reader on notice that Mullin is relying on his recollection of what a third party said." The part of the letter giving rise to this lawsuit reads as follows:

> The hearing on the plaintiff's motion for temporary injunction was held after the suit had been on file only a few weeks. The evidence certainly revealed a long running feud between the Lubbock DA's office and Kelly and Hubbard, but several points did not receive notice in your paper. One, Hubbard did not take the stand. Two, Kelly testified that he knew of no evidence that Ware had retaliated against him. Three, the Lubbock police department's internal files provided extensive evidence against Hubbard and Kelly. I strongly suggest that your newspaper review the files on the investigation of Hubbard and Kelly, which are now public records in their lawsuit, to make its own determination if those records exculpate or incriminate Hubbard and Kelly. Fourth, assistant DA Trey Hill testified by affidavit that he had been at a party and seen several of the plaintiffs' lawyers and AJ reporter Grady Simmons drinking a toast to the castration of Travis Ware.

Simmons was the "unbiased" reporter that your paper sent to cover the hearing, and the pro-plaintiff bias of this paper's coverage of the hearing as compared with the coverage in the Amarillo papers was very noticeable. For example, the Lubbock paper did not report the testimony of a Lubbock minister that one of the plaintiff's lawyers had told him that: "We know Hubbard and Kelly are bad cops and they have done a lot of bad things, but that doesn't mean Travis Ware can do whatever he wants to them." This testimony was reported in the Amarillo paper.

The rest of the letter is an attempt by Mullin to elaborate on the capital murder trial and Hubbard, Kelly, Ware, Sherrod, Erdmann, and other attorneys' involvement in the legal proceedings. He also attempted to explain the meaning and ramifications of the preliminary injunction granted by the federal judge in the Amarillo federal district court.

It is well settled that the core value of the First Amendment reflects a recognition of the fundamental importance of the free flow of ideas and opinions and about matters of public interest and concern. *Carr v. Brasher,* 776 S.W.2d at 570, *citing Hustler Magazine v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). However, in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Supreme Court cautioned that:

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in "uninhibited, robust, and wide-open debate" on public issues.

*Id.,* 418 U.S. at 339–40, 94 S.Ct. at 3006–07, *citing New York Times v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964).

▆▆▆ Section 73.005 of the Code provides that the truth of the statement in the publication on which an action for libel is based is a defense to the action.[3] In this state, we have adopted the "substantial truth" test by which we measure the truth or falsity of an allegedly libelous statement. *Rogers v. Dallas Morning News, Inc.,* 889 S.W.2d 467, 472 (Tex.App.—Dallas 1994), *Citing McIlvain v. Jacobs,*[4] 794 S.W.2d 14, 15–16 (Tex.1990). In applying that test, we must examine Mullin's letter in its entirety and decide whether the summary judgment evidence conclusively shows the "gist" of the statements contained in the letter is substantially true. *Id.* at 472. This requires us to determine whether, in the mind of the average reader, the alleged defamatory statements were more damaging to appellant's reputation than truthful statements would have been. *Id.* If the underlying facts as to the gist of the defamatory charge are undisputed, we can disregard any variance with respect to items of secondary importance and determine substantial truth as a matter of law. *McIlvain,* 794 S.W.2d at 16.

The summary judgment evidence shows that in his affidavit, Trey Hill averred he was at a party in Lubbock at which Simmons was also present. There was a keg of beer in the garage at the premises for the use of those in attendance. In the course of the evening, as he made several trips to the garage for more beer, Hill exchanged "polite greetings" with Simmons and others at the party. He then stated:

At one point, as I entered, a toast was proposed and made by Rod Hobson. He raised his glass and toasted the removal of the genitalia of Travis Ware. I believe that Pat Kelly was included in the people who raised their glasses and joined in the toast, however, I cannot say that I could

recall the identity of each person toasting with Rod Hobson. I was somewhat surprised that such a toast would be made, or continued in my presence and I was a little embarrassed, so I did not look directly at the group of people toasting. I filled my cup with beer and returned to the living room of the house. Except for going to the garage, I did not see the above-named individuals much.

It is my opinion that the toast I overheard is indicative of the fact that all the public criticism and the suit filed against Travis Ware is the result of personal animosity between certain defense attorneys in Lubbock and Mr. Ware. Pat Kelly & Bill Hubbard are merely being used as pawns in the personal quest of a few defense attorneys to unseat Travis Ware.

Reiterated, the exact language in Mullin's letter included in Simmons's complaint is: "Fourth Assistant DA Trey Hill testified by affidavit that he had been at a party and seen several of the plaintiff's lawyers and AJ reporter Grady Simmons drinking a toast to the castration of Travis Ware."

Simmons's summary judgment evidence in this regard consisted of excerpts from depositions of Ware and Simmons, and affidavits from three people who were at the party where the toast was made. Each averred that while they could not recall the identity of every person in the group who toasted the castration of Travis Ware, they were sure Simmons was not "standing in the group and did not join in the toast." One affiant averred he could not recall whether Trey Hill was in the garage when the toast was made, while the other two were sure he was not in the garage. Included in the evidence was an affidavit of the editor of the *Avalanche Journal* stating Simmons resigned in good standing and was not fired for any disciplinary reason.

Mullin's summary judgment evidence included excerpts from Simmons's deposition,

3. Tex.Civ.Prac. & Rem.Code Ann. § 73.005 (Vernon 1986).

4. *McIlvain* involved a private figure plaintiff and a media defendant. The Texas Supreme Court cited *Philadelphia Newspapers, Inc. v. Hepps,* 475

U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986) for the proposition that a private figure plaintiff must show that the speech at issue is false before recovering damages for defamation from a media defendant. 794 S.W.2d at 15.

affidavits of Hill, Ware, Mullin, and Mullin's legal assistant, a copy of the actual letter, copies of several newspaper articles, and statistics. In his affidavit, Mullin swore he had never been introduced to Simmons, he felt his statements about Hill's affidavit were true and accurate according to his recollection, that putting quotation marks around "unbiased" represented his personal opinion, and that he had others proofread the letter to check its accuracy before he sent it. He also stated he sent the letter to the newspaper's editor and Ware only.

Ware averred he asked Mullin to write a letter to the newspaper to put the federal court's grant of the preliminary injunction in proper perspective. He also claimed he had no knowledge that the statement in Mullin's letter was incorrect in any way, and that he had talked on the telephone with Hill about the toasting incident itself.

■ Viewed in its context, as we must view it, we find the summary judgment record sufficiently demonstrates the "gist" of the statement in question. In arriving at that conclusion, we note that in his deposition, Simmons admitted attending the party at which the toast was made, that the people in attendance were predominantly from the criminal defense side of the bar, and that he was there to "pick lawyers' brains." He also said that a toast was made in the garage and at the time of the toast, he was drinking a glass of beer; but he merely saw and heard the toast to "... castration of Travis Ware. I don't remember the exact words." He did state that he did not raise his glass, and "wasn't a party to the toast, and I wouldn't have been inclined to do so in the first place." When queried why he would not be so inclined, he replied, "It would have shown bias." Simmons also admitted he had been accused of being biased by at least two other people. We have previously noted Simmons's admissions that criticism of stories a reporter writes is natural for a reporter and "you just have to put up with it." When queried, he admitted this observation "holds true in these matters, as well, when ... writing these stories."

Simmons argues "... the difference of the damage to Simmons' reputation in the mind of the reader between the letter's statements and the actual occurrence is great." We disagree. In the mind of the average reader, the statements in question, if defamatory, were not more defamatory than the fact that he was present and participating in a party where such a toast was admittedly made, in the sense that his presence could have indicated an alliance with one side of the controversy, whether he "joined" in the toast or raised his glass in the toast. Additionally, in his affidavit, Mullin expressly stated he was relying upon another person's affidavit, which would diminish the credibility of his affirmation to the average reader.

In sum, even considering the secondary variance of whether Simmons raised his glass, when considered as a whole, the statements made in the letter concerning Hill's averments are substantially true. *McIlvain,* 794 S.W.2d at 16. Indeed, although Simmons argues that Hill averred he joined in the toast, he does not challenge the fact that Hill was present at the party, that he, Simmons, was also present, and that the toast took place in his presence.

We also note that Simmons showed no "special" damages. By his own admission, criticism that a reporter was biased or unfair in his stories was "natural for any reporter" and was an every day risk. The only job restriction his summary judgment evidence showed was a directive not to read stories about Ware before they were published. This directive was not made until after he filed this suit. His deposition testimony showed that his salary did not change after he was directed not to read stories about Ware, yet he voluntarily quit his job with the *Avalanche Journal* with the explanation that "[i]t had to do with the working conditions. If I were going to be prohibited from reading about certain subjects and sources, it is an intolerable situation for a reporter and editor." Since leaving the newspaper, Simmons has not sought any kind of employment as a reporter or editor. His deposition testimony revealed that after leaving the newspaper, he moved to Kemah, Texas, where he lived on and "fixed up" a boat he owned before this controversy. After a few months, he began working at a marina for $6.00 per hour. The

only other job for which he applied was as a substitute teacher in Galveston. Simmons also admitted he had never heard of anyone saying or indicating Mullin's letter made them think he was any less of a reporter.

▮▮▮ Because we find the statement about the toast was not defamatory, we need not determine whether Simmons was a limited purpose public figure which would require him to establish Mullin and Ware acted with malice.[5] *See Einhorn v. LaChance*, 823 S.W.2d 405, 413 (Tex.App.—Houston [1st Dist.] 1992, writ dism'd w.o.j.). A limited purpose public figure is one who may not be a celebrity or household name sufficient to be an all purpose public figure, but who has "thrust [himself] to the forefront of a particular public controvers[y] . . . ." *Gertz v. Welch*, 418 U.S. 323, 345, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789 (1974). The determination whether one is such a public figure is a matter of law to be decided by the court. *Einhorn*, 823 S.W.2d at 413. We do note, however, that the outcome of the suit in federal court and the ramifications of the preliminary injunction were matters of public interest, that Simmons played a significant part in presenting facts about the matter to the public, and Mullin's letter was germane to Simmons's participation in the controversy, *i.e.*, whether he was accurately reporting the facts. In his deposition, Simmons admitted he was the "primary reporter" covering the Amarillo hearings. Of the 87 articles about the controversy published in the Lubbock and Amarillo papers, Simmons authored at least 24. His name appeared in the byline in each of the articles he wrote. His work on Ware's federal case was a result of his coverage of the publicized controversy about Dr. Erdmann's work as a pathologist and testimony he had given in connection with criminal prosecutions. Simmons admitted there was an ongoing controversy about these matters.

▮▮▮ We must next determine whether Mullin's act of placing quotation marks around his description of Simmons as an "unbiased" reporter was defamatory. There is no separate articulated privilege for opinion under the First Amendment because opinions may be actionable if they imply false statements of objective fact. *Shearson Lehman Hutton*, 806 S.W.2d at 920, *citing Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). Whether a statement crosses the line between a protected expression of opinion and an actionable statement or implied false statement of objective fact, again, is a question of law. *Carr v. Brasher*, 776 S.W.2d at 570.

▮▮ As Simmons's attorney stated at the summary judgment hearing, albeit with the suggestion it crossed the line of accountability, Mullin's description of Simmons as "unbiased" was an expression of an opinion. Whether Simmons's reports were biased, considered in context and in the light of the entire controversy, was in the eye of the beholder and incapable of definitive proof one way or the other. Thus, the implication arising from the placement of the quotation marks was an expression of Mullin's opinion protected by article I, section 8 of the Texas Constitution and the First Amendment to the Federal Constitution. Simmons's first point of error is overruled.

## SECTION 1983 CLAIM AGAINST WARE

Included in Simmons's second point of error is a contention that Ware failed to conclusively establish there were no issues of material fact as to Simmons's 42 U.S.C. § 1983 claim. In his suit, Simmons alleged that Ware's publication of Mullin's allegedly libelous letter was made "under color of state law by the chief law enforcement officer of the State of Texas in Lubbock County" and was made in an effort to deprive him of "a liberty interest, the freedom of speech and the freedom of press, in violation of the Constitution of the United States." Therefore, he concluded, he was entitled to compensation for emotional distress, mental anguish, injury to reputation, and punitive damages.

---

5. With respect to defamatory statements, malice is the making of statements with knowledge they are false, or with reckless disregard whether they are false. *Galveston County Fair & Rodeo v.*

*Glover*, 880 S.W.2d 112, 120 (Tex.App.—Texarkana 1994, no writ), *citing Dun and Bradstreet, Inc. v. O'Neil*, 456 S.W.2d 896 (Tex.1970).

■ Simmons's § 1983 claim was derivative of his alleged defamation claim. As we have discussed in some detail, Mullin's statements in the letter which were "republished" when Ware distributed copies of the letter at the homebuilders' meeting were substantially true and thus, were not actionable. That holding precludes any claim that Ware, acting under color of any state statute, ordinance, regulation, custom or usage, deprived Simmons of any right, privilege or immunity to which he was constitutionally or statutorily entitled and the deprivation of which is a prerequisite to a § 1983 action. 42 U.S.C. § 1983 (1994); *see Hammond v. Katy Independent School Dist.,* 821 S.W.2d 174, 178 (Tex.App.—Houston [14th Dist.] 1991, no writ).

■ Although Simmons also alleges Ware failed to "properly address [Simmons's] allegation that [Ware] has used his office to intimidate and manipulate [Simmons] and the Press," he has failed to point out in what respect this is true or to support this argument with citation of case law or statutes in his summary judgment response or his appellate brief. By failing to present authority to support that contention, it has been waived. *Tobias v. University of Texas,* 824 S.W.2d 201, 207 (Tex.App.—Fort Worth 1991, writ denied), *cert. denied,* 506 U.S. 1049, 113 S.Ct. 966, 122 L.Ed.2d 122 (1993); Tex.R.App.P. 74(f).

## SLANDER

Included in his third point challenge is Simmons's contention that the trial court erred in granting Ware's summary judgment because there were material fact questions concerning his slander claim. Simmons alleged Ware stated at a Texas Tech candidates' rally that "Grady Simmons is no longer employed at the Avalanche Journal [sic]" and argues the clear implication of the statement was that the newspaper reports were false or biased and that he was fired because of these shortcomings. Thus, he reasons, the statement was defamatory, tends to injure him in his profession, and is slanderous *per se.* He also alleged malice and sought punitive damages.

We have viewed the videotape of the "Candidate's Forum" which was received in evidence at the summary judgment hearing. From our perusal of the tape, we learn the actual alleged slanderous statement is:

... The newspaper about which Mr. Sowder complains of, and for once I am not complaining of, the newspaper has relied upon the writings of a reporter who is no longer even working at that newspaper; and when they composed the editorials he is talking about when they asked me to resign; they were relying on that news reporter's stories. Come to find out the reporter's stories were not quite the way things happened. He no longer works there.

■ Simmons's initial attack upon this part of Ware's summary judgment is that Ware's assertion in his motion that Simmons's claim is "false" does not comply with Rule 166a of the Texas Rules of Civil Procedure which requires the motion for summary judgment to "state the specific grounds therefor." Tex.R.Civ.P. 166a(c). However, this type of failure does not in itself require reversal unless the party complaining of the defect files an exception pointing out that the lack of specificity leaves him without adequate information and the exception is overruled. *Jones v. McSpedden,* 560 S.W.2d 177, 179 (Tex.Civ.App.—Dallas 1977, no writ). Simmons filed no such exception and by failing to do so waived this complaint. In further considering Simmons's challenge, we bear in mind the rule that while a summary judgment may not be affirmed upon a ground not specified in the motion for summary judgment, when the order granting the summary judgment does not specify the ground upon which it is based, the judgment will be affirmed if any of the grounds stated in the motion are meritorious. *Carr v. Brasher,* 776 S.W.2d at 569.

■ Slander is a defamatory statement orally published to a third person without justification or excuse. *Shearson Lehman Hutton,* 806 S.W.2d at 921. The general rule is that oral words, though false and opprobrious, are not actionable without pleading and proof of special damages. *Einhorn,* 823 S.W.2d at 411, *citing Buck v.*

*Savage,* 323 S.W.2d 363, 368 (Tex.Civ.App.—Houston 1959, writ ref'd n.r.e.). Statements are slanderous *per se* if they are so obviously harmful to the person harmed that no proof of their injurious effect is necessary to make them actionable. *Shearson Lehman Hutton,* 806 S.W.2d at 921. Matters characterized as slanderous *per se* are statements that affect a person injuriously in his office, profession, or occupation. *Id.* In arguing there is a material fact issue whether he suffered harm, Simmons posits Ware's statements at the candidate's forum were slanderous *per se.* We disagree.

As we have before discussed, in determining whether a statement is actionable, the statements in their entirety must be examined. They must be construed as a whole in light of the surrounding circumstances and judged as a person of ordinary intelligence would perceive them. It is only if the statements are ambiguous or of doubtful import that a jury is called upon to determine their meaning and effect upon an ordinary person. *Einhorn,* 823 S.W.2d at 411.

Publication of a defamatory statement does not require the plaintiff be named if those who know and are acquainted with the plaintiff understand the statement refers to him or her. *Galveston Co. Fair & Rodeo v. Glover,* 880 S.W.2d 112, 119 (Tex.App.—Texarkana 1994, no writ). In other words, the fact that Simmons was not specifically named would not, in and of itself, prevent recovery.

Apparently recognizing this, although he does not specifically articulate an "innuendo" claim, Simmons makes such an argument in claiming that the "clear implication" of Ware's statement was that Simmons's reports were false or biased and that he was fired because of those reports. An innuendo may be used to explain but not to extend the effect and meaning of the language asserted to be actionable. The test for actionable "innuendo" is not what construction a plaintiff might place upon the statements, but rather, how the statement would be construed by the average reasonable person or the general public, *Schauer,* 856 S.W.2d at 448, *citing Arant v. Jaffe,* 436 S.W.2d 169, 176 (Tex.Civ.App.—Dallas 1968, no writ). Again, it is the court's duty to determine if the statements in question are capable of the meaning ascribed to them by the innuendo, and, if in the natural meaning of the statements, they are not capable of a defamatory interpretation, the case must be withheld from the jury. *Id.*

Ware's summary judgment evidence on this point consisted of the videotape and his affidavit averring "I did not mention Grady Simmons by name." In his response, Simmons included and placed primary reliance upon the affidavit of Texas Tech journalism professor Freda McVay. McVay swore that "From my understanding of the events leading up to the editorial in question, and from my familiarity with and interest in local press coverage, I knew Travis Ware was referring to Grady Simmons as the unnamed 'reporter.'" However, because of her background and expertise, McVay's interpretation of Ware's statement is not that of the average reasonable or ordinary person.

While Ware's statements might be considered to be aimed at Simmons by those who were involved in and thoroughly cognizant of the events we have mentioned, lacking that sort of specialized interest and background, the average person would not recognize the remarks as being directed at a specific reporter, as contrasted to reporters in general. That being true, the ordinary person would not conclude that Simmons in particular was unfair or biased and was fired because of reports reflecting that bias or untruths; therefore, the remarks were not slanderous *per se.*

Parenthetically, we note the remarks were at least substantially true. Simmons admitted in his deposition testimony that he was the "primary" reporter covering the federal proceeding in Amarillo as well as the Ware, Erdmann, Hubbard and Kelly controversies. The newspaper did print several of his stories, and Simmons no longer worked at the *Avalanche Journal* at the time of the remarks. Under the authorities we have cited, if the truth of the facts underlying the gist of the alleged defamatory remarks is undisputed, we may disregard variances of secondary importance and determine substantial truth

as a matter of law. Under this record, Ware's remarks did not rise to the standard required to support a slander recovery. That showing would also negate an essential element of Simmons's slander action against Ware. We hold the trial court did not reversibly err in granting summary judgment on Simmons's slander claim.

In summary, all of Simmons's points of error are overruled and the judgment of the trial court affirmed.