ABC, INC., Appellant,

v.

Eugene E. SHANKS, Sr. and Fliteline Maintenance, Inc., Appellees.

No. 13–99–050–CV.

Court of Appeals of Texas, Corpus Christi.

Aug. 5, 1999.

Rehearing Overruled Sept. 23, 1999.

Robert P. Latham, Jackson & Walker, LLP, Susan W. Davidson, Houston, for appellant.

George E. Crow, Katy, for appellee.

Before Justices DORSEY, HINOJOSA, and RODRIGUEZ.

## OPINION

Opinion by Justice RODRIGUEZ.

Appellant, ABC, Inc. ("ABC"), brings this interlocutory appeal[1] from the denial of its motion for summary judgment in this defamation suit brought by appellees, Eugene E. Shanks, Sr. and Fliteline Maintenance, Inc. We reverse and render.

On November 17, 1994, ABC aired a report entitled "Second Hand Safety" on its *PrimeTime Live* program. The segment focused on the widespread market for bogus airplane parts in the United States and the Federal Aviation Administration's (the "FAA") ineffectiveness in dealing with the problem. A component of the broadcast discussed Shanks's and Fliteline Maintenance's involvement in the use of bogus parts in repairing jet Turbo-Prop engines and their history with federal prosecutors and regulators.

Apparently, in the two years prior to the broadcast, Shanks and Fliteline were the subjects of federal investigations regarding bogus airplane parts. In particular, Shanks and Fliteline were investigated regarding the crash of an Aero S2R that killed Billy Kenney in 1992. The plane Kenney was flying had been repaired by and was purchased from Shanks. After the accident, the National Transportation Safety Board ("NTSB") determined that a bogus propeller pitch control ("PPC") cam had been installed on the plane and was a probable cause of the accident. This determination was challenged by appellees, but was not modified, amended, or rescinded in any way prior to the broadcast.

---

1. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(6) (Vernon Supp.1999).

In response to the FAA's findings regarding Shanks and Fliteline, the FAA issued several documents intended to identify other aircraft that could contain the bogus PPC cams, and it revoked Shanks's and Fliteline's repair licenses. Upon challenge by appellees, an agreement was reached whereby Shanks agreed never to work on aircraft again and not to reapply for his A & P license, and Fliteline agreed not to reapply for its license for one year, move its facilities to a new location, and employ a new director of maintenance.

Shanks was later indicted by a federal grand jury on eight counts of installing unauthorized parts in engines and aircraft, making false statements in aircraft log book entries, and causing the death of Billy Kenney. Shanks entered into a plea agreement with federal prosecutors, whereby he pleaded guilty to two felony counts pertaining to falsifying records. He was sentenced to three years probation, fined $10,000, required to perform two hundred hours of community service, and agreed never to reapply for his FAA mechanic's license.

Thereafter, the FAA issued a proposed Airworthiness Directive ("AD") targeted at appellees, where it estimated five hundred engines in the United States had been repaired by appellees which would have cost an estimated $2.2 million to remedy. This AD was challenged by appellees.

ABC's broadcast contained much of the above information as well as information on a bogus parts dealer in Miami and the crash of a commuter airplane in Norway that killed fifty-five people. The cause of the crash was traced to bogus parts from the United States. Asserting statements made in the broadcast were defamatory, appellees sued ABC. ABC moved for summary judgment, which the trial court denied. This appeal followed.

In its first and second issues, ABC claims the trial court erred in denying its motion for summary judgment because the statements that appellees complained of are not actionable.

To be entitled to summary judgment, a defendant must establish there is no genuine issue of material fact concerning at least one essential element of a plaintiff's cause of action, *Gibbs v. General Motors Corp.*, 450 S.W.2d 827, 828 (Tex.1970), or conclusively show each element of an affirmative defense. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex.1979). When reviewing a motion for summary judgment we take as true all evidence favorable to the nonmovant and indulge every reasonable inference in the nonmovant's favor. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 549 (Tex.1985).

To maintain a defamation cause of action, the plaintiff must show the defendant: (1) published a factual statement; (2) that was defamatory; (3) concerning the plaintiff; (4) while acting with either actual malice, if the plaintiff was a public official or public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement. *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex.1989) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)); *see WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1358, 143 L.Ed.2d 519 (1999). It is well-established in Texas that truth, or "substantial truth," is an absolute defense to a libel action. Tex. Civ. Prac. & Rem. Code Ann. § 73.005 (Vernon 1997); *McIlvain v. Jacobs*, 794 S.W.2d 14, 15 (Tex. 1990); *TSM AM–FM TV v. Meca Homes, Inc.*, 969 S.W.2d 448, 452 (Tex.App.—El Paso 1998, pet. denied); *Mitcham v. Board of Regents, Univ. of Tex. Systems*, 670 S.W.2d 371, 373 (Tex.App.—Texarkana 1984, no writ). A statement is substantially true where the alleged defamatory statement is no more ignominious in the mind of the average listener than a true statement would have been. *KTRK Television, Inc. v. Fowkes*, 981 S.W.2d 779, 788 (Tex.App.—Hous. [1 Dist.] 1998, pet. de-

nied); *Carr v. Mobile Video Tapes, Inc.,* 893 S.W.2d 613, 619 (Tex.App.—Corpus Christi 1994, no writ). In making a substantial truth determination, we look to the "gist" of the broadcast. *McIlvain,* 794 S.W.2d at 16; *Carr,* 893 S.W.2d at 618. Where the underlying facts are undisputed as to the gist of the libelous charge, we disregard any variance regarding items of secondary importance and determine substantial truth as a matter of law. *McIlvain,* 794 S.W.2d at 16; *Carr,* 893 S.W.2d at 618. "It is not the function of the court to serve as senior editor to determine if the reporting is absolutely, literally true; substantial truth is sufficient." *San Antonio Express News v. Dracos,* 922 S.W.2d 242, 249 (Tex.App.—San Antonio 1996, no writ) (quoting *Wavell v. Caller Times Publishing Co.,* 809 S.W.2d 633, 636 (Tex. App.—Corpus Christi 1991, writ denied)).

In Plaintiff's Second Amended Original Petition, the appellees assert twenty-two specific statements from the broadcast were defamatory. We will address each statement as presented in the pleadings.

1. *As for Shanks, federal prosecutors say there wasn't enough evidence to prove beyond a reasonable doubt that he actually caused the fatal crash. But last year, Shanks pleaded guilty to falsifying log books involving work on another aircraft. He lost his FAA license, and his company's was suspended.*

■ Shanks conceded in his deposition that the above statement is substantially true, merely clarifying "My license—my A & P license was revoked, and Fliteline Maintenance's was temporarily suspended until we moved it to another location." Additionally, the federal prosecutor who was handling the Shanks case testified that she did not prosecute Shanks on the charge of killing Billy Kenney because she could not prove it beyond a reasonable doubt. We find this sufficient to show this statement was substantially true.

2. *He had just taken off the air strip, gone into the air approximately 250 feet, and suddenly there was a high-pitched sound and the airplane pitched and went nose first into the ground.*

■ This statement was made by Clarice Kenney, widow of Billy Kenney who was killed when the airplane he had purchased from Shanks crashed. While it is true that the airplane discussed in this statement was the one in which Shanks had installed a bogus PPC cam, there is nothing defamatory about the statement, nor does it concern appellees. It is merely an eyewitness's account of the accident.

3. *Instead, each piece of this junk was found on an airplane, passed off as fully repaired and safe engine parts. . . .*

■ This statement was made by Lloyd Ericcson, an aviation lawyer, in discussing bogus parts found on certain aircraft. There was no mention that any of the parts came from an aircraft repaired by Shanks or Fliteline, a point acknowledged by Shanks in his deposition. In fact, these statements were made before appellees were even mentioned in the broadcast. We find this statement was not made concerning appellees and, therefore, cannot support appellees' defamation claim.

4. *And the fact is, a lot is going on in places the FAA rarely gets to.*

■ The context in which this statement was made dealt with emphasizing that with the advent of overnight shipping and efforts to cut costs, airplane maintenance is being done in more rural areas, such as by Fliteline in Wharton, Texas. Thereafter, Terry Kieler, a former Fliteline employee, explained that the FAA inspected Fliteline once or twice a year. Appellees argued the statement was false because the FAA "made very regular inspections" of Fliteline's facilities. Assuming the truth of this statement, we are not convinced this negates ABC's evidence that shows the FAA only inspected Fliteline once or twice a year—merely because inspections are regular does not suggest that they are any

less infrequent. We find the above statement to be substantially true. Even if we were to assume, *arguendo*, that the statement was not true, it is in no way defamatory toward appellees.

> 5. *Terry Kieler used to work for Flightline [sic] Maintenance, and he says there was plenty the FAA inspectors missed.*

■ Appellees, referencing Kieler's deposition testimony, assert Kieler never made such a statement. However, in Kieler's affidavit, he unequivocally admits that while he did not use the specific words contained in the broadcast, "the comments attributed to [him] … are true and correct representations of the statements [he] made." Furthermore, he specifically stated that the FAA inspectors missed the number of engines that could be worked on at any given time, they missed parts that were not tagged correctly, did not properly check paperwork, and did not inspect the calibration of tools. We are convinced the above statement is substantially true.

> 6. *Tragically, it was only after a fatal crash that the FAA finally began to move against Flightline [sic] Maintenance and its owner, Gene Shanks.*

■ Appellees contend the statement is false because Shanks was not the owner of Fliteline in 1992 or in 1994 and that it implies the FAA had reason to and/or was planning to investigate Shanks and Fliteline prior to the accident. This argument is without merit. First, Shanks was the sole owner of Fliteline when he installed the bogus part on the airplane he later sold to Kenney and when he falsified documents which led to his indictment and guilty plea in federal court. Next, we find the statement substantially true. Shanks and Fliteline admittedly committed FAA violations prior to the crash, the FAA did *not investigate those violations until after* the crash, and Shanks, as noted above, was the owner of Fliteline during the relevant periods. The mere fact that the statement may suggest that the FAA should have investigated appellees sooner is of no consequence because the alleged defamatory statement is not more damaging in the mind of the average listener than the statements that Shanks and Fliteline had committed FAA violations before the Kenney crash prompted the FAA investigation.

> 7. *When the National Transportation Safety Board and the FAA went through the wreckage, they determined that Shanks had installed a bogus part in the propeller control unit, not one from an approved manufacturer, but one Shanks had made for hundreds of dollars less at this local machine shop.*

■ This statement is absolutely true. There is no question that the NTSB and FAA sorted through the wreckage of the Kenney airplane after its crash. Shanks admitted the NTSB and FAA determined the bogus part was installed on the aircraft and that he had installed it. Shanks, however, takes issue with the comment that the bogus part cost hundreds of dollars less because that was not part of the NTSB or FAA report. This argument is without merit. ABC did not contend that the NTSB or the FAA determined the bogus part cost hundreds of dollars less, instead it based this statement on Shanks's admission that he paid little more than $100 and the government's investigation which determined the actual price of $150. They then compared these figures with the price of a cam purchased from the engine's manufacturer, which was $689. Accordingly, we find statement seven to be a true statement.

> 8. *And now, only now, some two years after the accident, the FAA is trying to find out how many other jet TurboProp engines around the country Gene Shanks has worked on.*

■ Appellees argue the statement is false because the FAA did not attempt to identify aircraft "by serial number or by

engine or to quantify the engines worked on by Shanks or Fliteline." This is irrelevant because there is ample evidence in the record that the FAA was, in fact, attempting to identify other airplanes that had been repaired by Fliteline. As noted above, Shanks was the owner and operator of Fliteline when the bogus part was installed on the Kenney aircraft. We therefore find the above statement to be substantially true.

> 9. *One of his customers was the Air-Vantage commuter line of Minneapolis, which says it has already discovered, and removed, suspicious parts installed by Shanks.*

██ While in his affidavit Shanks asserts he "never installed parts on any AirVantage aircraft," he admitted in his deposition testimony that AirVantage was one of his customers. Furthermore, the evidence indicates AirVantage did discover and remove "suspicious" parts from some of its aircraft that it reported were installed by Shanks. We find this statement to be substantially true.

> 10. *He lost his FAA license and his company's was suspended.*

There is no doubt this statement is absolutely true. Therefore, appellees' contention that it was a defamatory statement is without merit.

> 11. *Another daughter, Vicki, is now president of the old Flightline [sic] Maintenance and she says her father, who did not go to prison, is just an employee.*

Appellees contend this statement, when considered in conjunction with statement one, supports defamation by innuendo.

██ "The test for actionable 'innuendo' is not what construction a plaintiff might place upon the statements, but rather, how the statement would be construed by the average reasonable person or the general public." *Simmons v. Ware,* 920 S.W.2d 438, 451 (Tex.App.—Amarillo 1996, no writ); *see also Schauer v. Memorial Care Systems,* 856 S.W.2d 437, 448 (Tex.

App.—Hous. 1 Dist.] 1993, no writ). It is the court who determines whether the alleged defamatory statements are capable of the meaning ascribed to them by the innuendo. *Simmons,* 920 S.W.2d at 451. If the statements cannot properly be construed as ambiguous nor in their ordinary and proper meaning convey a defamatory interpretation, such meaning cannot be enlarged or restricted by claims of innuendo. *Gartman v. Hedgpeth,* 138 Tex. 73, 157 S.W.2d 139, 141 (1941); *Simmons,* 920 S.W.2d at 451.

Here, considering statement eleven in context with statement one, the purport of the statements is clear and unambiguous—Shanks was investigated for FAA violations, he was originally charged with falsifying FAA records and causing the death of Billy Kenney, he pleaded guilty to falsifying FAA records, the prosecutor dropped the charge regarding the Kenney crash because she could not prove it beyond a reasonable doubt, Shanks lost his mechanic's license, and was placed on probation. Also, given their ordinary and usual meaning, we find nothing that would support appellees' defamation by innuendo claim.

> 12. *These red tags represent junk.*

██ This was the statement of Lloyd Ericsson regarding parts that he considered to be "junk." While Shanks complained about this statement in his petition, he stated in his deposition that "they [the parts] are exactly what he [Ericsson] said, they were junk." Additionally, the statement was made before any discussion of Shanks or Fliteline and does not concern them. Accordingly, we hold the statement was not defamatory.

> 13. *And the man signed it off as an FAA-approved part just so he could collect the difference in the money.*

Statement thirteen was made by Clarice Kenney regarding Shanks's installation of a bogus part on the aircraft Billy Kenny purchased from Shanks. Appellees com-

plain that Shanks never signed off on the part he installed, nor did he "collect" any money.

Kenney's comment regarding Shanks signing off on the part is absolutely true. In a document entitled "Major Repair and Alteration" that concerns the installation of the PPC cam on the Kenney aircraft, Shanks's signature appears after the following certification:

> I certify that the repair and/or alteration made to the units identified in Item 4 above and described on the reverse or attachments hereto have been made in accordance with the requirements of Part 43 of the U.S. Federal Aviation Regulations and that the information furnished herein is true and correct to the best of my knowledge.

Additionally, Shanks's signature appears in the log book of the engine in the Kenney aircraft as being "installed per original Marsh ... STC 3227 WE." We find this evidence sufficient to show Shanks did, in fact, sign off on the bogus part.

■■■ Next, we consider his contention that he did not "collect" any money for the repair. We agree with appellees that Kenney's suggestion that Shanks "collected" the difference between the bogus part and an authorized part is false. Because the aircraft belonged to Shanks before he sold it to Kenney, it was his own aircraft in which he installed the bogus part. It is obvious that he would not have "collected" any money for the repair. However, as noted above, a false statement is defamatory unless it is no more harmful than the truth. Here, the undisputed truth is that Shanks "saved" the difference between purchasing an approved PPC cam and the bogus one. We find the truth would have subjected Shanks to the same degree of public ridicule as the statement as made. Accordingly, we hold it was not defamatory.

14. *This [sic] counterfeit bolts proved fatal.*

15. *Before it's installed each airplane is supposed to have one of these yellow tags—a yellow tag certifying that it has been approved by the Federal Aviation Administration or a red tag, which means the part does not meet FAA standards.*

16. *Inspections and tagging are supposed to prevent substandard parts from being installed.*

17. *One big problem is that the FAA and the industry rely on a kind of honor system to assure safety, a system easy to get around.*

18. *What's more, in a preliminary report for Congress now being circulated around Washington, the FAA states flatly "counterfeit or fraudulently documented parts have never been cited as a cause or contributing factor in a U.S. aircraft accident."*

19. *They say here "never been cited as a cause or a contributing factor."*

20. *Absolutely. If it's got a yellow tag on it, it's okay to install.*

21. *It doesn't make any difference where the yellow tag came from, because most people don't question it.*

22. *Every single air carrier aircraft operating in the United States has unapproved parts installed on it.*

None of the above statements "concern" appellees. As explained above, to be defamatory, the statement must concern the party allegedly defamed. Accordingly, we hold statements fourteen through twenty-two cannot be defamatory statements as to appellees.

■■■ In their brief, appellees assert five additional statements, not raised in their Second Amended Original Petition, as being defamatory. Because these statements were not raised in the trial court, the court could not have considered them in its determination on appellant's summary judgment. Likewise, we may not consider them now. *See* TEX.R. CIV. P. 166a(c) (stating "[i]ssues not expressly pre-

sented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal"); *Campos v. Investment Management Properties, Inc.*, 917 S.W.2d 351, 354 (Tex. App.—San Antonio 1996, writ denied).

Because none of the twenty-two statements alleged by appellees is defamatory, we hold the trial court erred in denying ABC's motion for summary judgment. Consequently, we sustain ABC's first and second issues.

Due to the disposition of the above points, we need not address ABC's remaining issues. TEX.R.APP. P. 47.1.

We REVERSE the judgment of the trial court and RENDER that appellees take nothing.